NEXTEL WEST CORPORATION, Voicestream Columbus, Inc. d/b/a T–Mobile, Voicestream GSM I Operating Company, Inc. d/b/a T–Mobile, Omnipoint Holdings, Inc. d/b/a T–Mobile, and Powertel Kentucky, Inc. d/b/a T–Mobile, U.S. Cellular Corporation, Cellco Partnership, d/b/a Verizon Wireless, and Smithville Telephone Company, Inc., Daviess–Martin County Rural Telephone Corporation, Rochester Telephone Company, Inc., and Clay County Rural Telephone Co-operative, Inc., Appellants,

v.

INDIANA UTILITY REGULATORY COMMISSION, Indiana Bell Telephone Company, Inc. d/b/a SBC Indiana, Indiana Exchange Carrier Association, Inc., Sprint Communications Company, L.P. and United Telephone Company of Indiana, Inc. d/b/a Sprint, and AT & T Communications of Indiana GP and TCG Indianapolis, Appellees.

No. 93A02–0404–EX–315.

Court of Appeals of Indiana.

July 15, 2005.

Alan M. Hux, Kortepeter, McPherson, Hux, Freihofer & Minton, Indianapolis, Martin C. Rothfelder, Pro Hac, Rotherfelder Stern, L.L.C., Westfield, NJ, Michael B. Cracraft, Joseph M. Hendel, Hackman, Hulett & Cracraft, LLP, Indianapolis, Rick D. Doyle, Greenwood, for Appellants.

Karl L. Mulvaney, A. David Stippler, Christopher M. York, Bingham McHale, LLP, Brian D. Robinson, Clayton C. Miller, Baker & Daniels, Larry J. Wallace, Parr, Richey, Obremsky & Morton, William B. Powers, Boberschmidt & Powers, P.A., Charles R. Mercer, Jr., Indianapolis, for Appellees.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellants, consisting of Nextel West Corporation (Nextel); VoiceStream Columbus, Inc. d/b/a T–Mobile, VoiceStream GSM I Operating Company, Inc. d/b/a T–Mobile, Omnipoint Holdings, Inc. d/b/a T–Mobile, and Powertel Kentucky, Inc. d/b/a T–Mobile (collectively, T–Mobile); U.S. Cellular Corporation (U.S. Cellular); Cellco Partnership, d/b/a Verizon Wireless (Verizon) (collectively, the Wireless Carriers); and Smithville Telephone Company, Inc. (Smithville), Daviess–Martin County Rural Telephone Corporation (Daviess–Martin), Rochester Telephone Company, Inc. (Rochester), and Clay County Rural Telephone Cooperative, Inc. (Clay County) (collectively, the RLEC Appellants), appeal a decision and order of the Indiana Utility Regulatory Commission (the Commission), which is defended by Appellees Indiana Bell Telephone Company, Inc. d/b/a SBC Indiana (SBC Indiana); the Indiana Exchange Carrier Association, Inc. and its member telephone companies (INECA); Sprint Communications Company L.P. and United Telephone Company of Indiana, Inc. d/b/a Sprint (Sprint); and AT & T Communications of Indiana GP and TCG Indianapolis (AT & T) (collectively, the Settling Party Appellees).

We affirm and remand in part.

### ISSUES

Appellants raise five issues on appeal, which we restate as the following:

(1) Whether the Commission erred in concluding that it had the requisite statutory authority to establish and administer an Indiana Universal Service Fund ("IUSF"); [1]

(2) Whether the Commission's Order (the IUSF Order) approving the Phase II Settlement Agreement (the Settlement Agreement) was supported by sufficient findings of fact and substantial evidence;

(3) Whether the RLEC Appellants' due process rights were violated;

(4) Whether the Commission erred in determining that the Settlement Agreement is in the public interest; and

(5) Whether the Commission erred in determining that the Settlement Agreement complies with federal law.

---

1. Only the Wireless Carrier Appellants challenge the Commission's legal authority to establish the IUSF.

## FACTS AND PROCEDURAL HISTORY

On November 28, 2001, INECA, an association of rural local exchange carriers (RLECs), filed a petition under Cause No. 42135 requesting that the Commission temporarily suspend its policy of "mirroring" interstate access rates at the intrastate level in light of the "MAG Order" released by the FCC on November 8, 2001.[2] On December 27, 2001, the Commission issued an order denying INECA's request for temporary suspension but granting INECA's request for a comprehensive investigation into the effect of the MAG Order on the Commission's mirroring policy. On that same day, the Commission, on its own motion, initiated the investigation through issuance of an order under Cause No. 42144.

Following a prehearing conference held on February 5, 2002, the Commission issued its Prehearing Conference Order on February 14, 2002, announcing that the investigation was to proceed in two phases. Phase I was initiated to allow the parties to focus on resolving "only those issues that needed to be resolved with respect to the Commission's practice of mirroring policies adopted in various orders in Cause No. 40785 and the interstate access rate and rate structure changes scheduled to take effect on July 1, 2002, arising from

[the MAG Order]." (Wireless Carriers' App. p. 111). The Prehearing Conference Order provided for the parties to file issues lists and testimony prior to a hearing to resolve the Phase I issues, and provided for an order to be issued by July 1, 2002. Phase II was to "continue the investigation to address the remaining issues, including any appropriate issues identified by interested parties at a later date." (Wireless Carriers' App. p. 106).

On May 29, 2002, the Commission issued the Interim Order approving a settlement agreement executed by some of the parties to the Phase I proceeding.[3] The Phase I Settlement Agreement stated that the Commission's mirroring policy should continue "until such time as the Commission orders otherwise." (Wireless Carriers' App. p. 119). As an interim measure, however, the Phase I Settlement Agreement set forth a two-step formula designed to recover, at least in part, the "intrastate revenue reductions [that] have resulted from mirroring changes in the interstate access rate design associated with federal actions." (Wireless Carriers' App. p. 119). According to the Phase I Settlement Agreement, the parties agreed that the Phase I revenue recovery methods would remain in effect until implementation of an

2. RLECs are incumbent local exchange carriers providing basic local telephone service in primarily rural areas in Indiana. Mirroring is a regulatory practice/policy adopted by the Commission that requires incumbent local exchange carriers (ILECs) to mirror at the intrastate level the rates and rate structures of the applicable interstate carrier access charges established by the FCC. "MAG Order" is the abbreviated name for the Second Report and Order and Further Notice of Proposed Rulemaking, *In the Matter of Multi-Association Group (MAG) Plan for Regulation of Interstate Services of Non–Price Cap Incumbent Local Exchange Carriers and Interexchange Carriers*, CC Docket Nos. 00–256, 96–45, 98–166, FCC 01–304, 16 FCC Rcd. 19613,

2001 WL 1381097 (November 8, 2001), available at *http://hraunfoss. fcc.gov/edocs_ public/attachmatch /FCC–01–304A1.pdf*.

3. Signatory parties to the Phase I Settlement Agreement were the following: Clay County Rural Telephone Cooperative, Inc.; Smithville Telephone Company, Inc.; Northwestern Indiana Telephone Company; INECA on behalf of the Member Companies specifically listed in Appendix A; AT & T Communications of Indiana GP and TCG Indianapolis; Sprint Communications Company, L.P. and United Telephone Company of Indiana, Inc. d/b/a Sprint; and Indiana Bell Telephone Company, Inc. d/b/a Ameritech Indiana.

alternative method approved by the Commission in Phase II.

The Interim Order also set forth a process for resolving the remaining issues in Phase II. According to a May 15, 2002, docket entry, the parties were to participate in a series of "technical conferences," at which they would discuss and attempt to resolve a variety of interrelated rate design and revenue recovery issues associated with intrastate implementation of the MAG Order's rate design proposals. (Wireless Carriers' App. p. 108). In this same docket entry, the Commission also approved the formation of an Executive Committee consisting of members representing various interests in Cause No. 42144; the Executive Committee was charged with preparing and filing a preliminary and final report with the Commission. The preliminary report was to be filed on June 19, 2002, following the initial technical conference, and was to include a list of the issues to be addressed in Phase II and a list of the wireless companies in the state that should be notified by publication of the proceeding. The final report was to be filed on October 15, 2002, and could include "a Minority Report that expresse[d] the views of any party that disagree[d] with any of the conclusions reached by the majority. . . ." (Wireless Carriers' App. p. 116).[4]

Additionally, as a preliminary matter, the Commission requested that counsel for each party file with the Commission a legal brief analyzing, discussing, and presenting conclusions regarding the Commission's "legal authority to establish a state universal service fund as part of Phase II of this proceeding." (Wireless Carriers' App. p. 116). The Wireless Carriers (except U.S. Cellular, which did not petition to intervene until September 27, 2002) each sought and were granted permission to intervene and subsequently filed joint or individual briefs arguing against the Commission's legal authority to establish a state universal service fund. By a docket entry dated July 18, 2002, the Presiding Officers, acting on behalf of the Commission in response to a concern expressed by some of the parties that some wireless carriers had not received adequate notice of the investigation, amended the caption of Cause No. 42144 by adding the following: "Respondents: All Telecommunication Service Providers, Including Intrastate Wireless Carriers, in the State of Indiana." (Wireless Carriers' App. p. 131).

On August 9, 2002, the Wireless Carriers filed a motion to dismiss the proceeding, presenting four arguments in support of their contention that the Commission lacked jurisdiction in the proceeding. On December 2, 2002, the Presiding Officers denied the Wireless Carriers' motion. The Wireless Carriers appealed the denial to the full Commission, which subsequently affirmed the denial.

On December 5, 2002, INECA, AT & T Communications of Indiana, Ameritech Indiana, and Sprint submitted a Phase II Settlement Agreement (the Settlement Agreement) to the Commission for its approval. The Settlement Agreement supports the Commission's continued mirroring of interstate access rates and rate structures at the intrastate level but also provides for the partial recovery of intrastate access rates. It provides in pertinent part as follows:

4. In its Final Report, filed with the Commission on October 22, 2002, the Executive Committee stated that "due to the complexity of the issues and the disparate positions of the various parties, the Executive Committee ultimately is unable to present in the context of a Final Report a settlement of the issues or subset of the issues to the Commission at this time." (Wireless Carriers' App. p. 151).

The revenues from RLECs' intrastate access rates were negatively impacted by the FCC's MAG Order. As a result, the public interest will be served by providing for the RLECs' recovery, in part, of such intrastate revenue losses resulting from the continued mirroring of interstate access rates: (1) through the process of rate rebalancing by the establishment of "benchmark" residential and single-line business local exchange service rates for the RLECs that are reasonably comparable to rates for those services in urban areas, and which are just, reasonable[,] and affordable (the "Benchmark Rates"); and (2) through the creation of an Indiana Universal Service Fund (hereafter "IUSF") to provide for recovery of (i) any remaining revenue shortfall that would continue to be otherwise sustained by the RLECs notwithstanding implementation of the Benchmark Rates, as herein provided, due to decreased intrastate access rates brought about by either the mirroring of the MAG Order's rate design or (ii) the RLECs' costs of providing service not otherwise recovered through the revenues generated by the RLECs' local service and intrastate access rates.

(Wireless Carriers's App. pp. 71–72).

By a docket entry dated December 17, 2002, the Presiding Officers scheduled an evidentiary hearing and set forth a procedural schedule for allowing parties to present testimony as to whether the Settlement Agreement is in the public interest. Following submittal of pre-filed testimony and a discovery period, the Presiding Officers held evidentiary hearings on March 13 and 14, and May 21, 22, and 23, 2003. Thereafter, multiple parties filed objections to the Settlement Agreement. Nonetheless, on March 17, 2004, the Commission issued an order (the IUSF Order) approving the Settlement Agreement with modifications.

Appellants now appeal. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. The Commission's Authority to Create the IUSF[5]

First, the Wireless Carriers contend that the Commission lacks the requisite statutory jurisdiction to create the IUSF. Specifically, the Wireless Carriers argue that because the Commission is a creature of statute, the Commission can exercise only such power as the legislature specifically delegates to it. Here, the Wireless Carriers continue, there is no state or federal authority providing the Commission with jurisdiction to create the IUSF; thus, the Commission's order approving the establishment of the IUSF is contrary to law. We disagree.

With regard to our standard of review on this question, the Settling Party Appellees urge us to review the Commission's jurisdictional determination under the deferential standard of review set forth in *IDEM v. Boone County Resource Recovery Systems, Inc.*, 803 N.E.2d 267 (Ind.Ct. App.2004), *trans. denied.* In that case, we stated that "[w]hen a statute is subject to different interpretations, the interpretation of the statute by the administrative agency charged with the duty of enforcing the statute is entitled to great weight, unless that interpretation is inconsistent with the statute itself." *Id.* at 273. However, we agree with the Wireless Carriers that this issue presents a legal question that we

---

5. Pursuant to Indiana Appellate Rule 48, both the Wireless Carrier Appellants and the Settling Party Appellees have submitted additional authority, which we have reviewed, pertaining to the Commission's authority to establish the IUSF.

review *de novo.* *See Ind. Bell Telephone Co., Inc. v. Ind. Util. Regulatory Comm'n,* 715 N.E.2d 351, 354 (Ind.1999) ("The Commission's jurisdiction under Indiana Code § 8-1-2-83(a) is a legal question this Court reviews *de novo.*").

In the IUSF Order, the Commission wrote, "We recognize that the adoption of any state universal service mechanism must be done within the scope of our jurisdiction and pursuant to statutorily prescribed procedures." (Wireless Carriers' App. p. 51). The Commission went on to conclude that

> IC §§ 8-1-2 and 8-1-2.6, particularly the legislative direction to exercise our jurisdiction so as to maintain universal telephone service (IC § 8-1-2.6-1(1)) and the broad discretion to develop regulatory procedures or generic standards (IC § 8-1-2.6-3), provide the statutory authority for our implementation of an IUSF.

(Wireless Carriers' App. p. 51).[6]

Section 1 of the ARS, entitled "Legislative declaration," provides as follows:

The Indiana general assembly hereby declares that:

(1) the maintenance of universal telephone service is a continuing goal of the Commission in the exercise of its jurisdiction;

(2) competition has become commonplace in the provision of certain telephone services in Indiana and the United States;

(3) traditional Commission regulatory policies and practices and existing statutes are not designed to deal with a competitive environment;

(4) an environment in which Indiana consumers will have available the widest array of state-of-the-art telephone services at the most economic and reasonable cost possible will necessitate full and fair competition in the delivery of certain telephone services throughout the state; and

(5) flexibility in the regulation of providers of telephone services is essential to the well-being of the state, its economy, and its citizens and that the public interest requires that the Commission be authorized to formu-

---

**6.** The Commission also concluded in the IUSF Order that "[p]ursuant to 47 U.S.C. 254(f), the Commission has the express authority to establish its own state universal service fund[,]" and that "[i]n accordance with 47 U.S.C. 332(c)(3)(A), states do have authority to assess fees from wireless carriers for a state universal fund." (Wireless Carriers' App. p. 52). 47 U.S.C. § 254(f) provides in pertinent part as follows:

> A State may adopt regulations not inconsistent with the [Federal Communications] Commission's rules to preserve and advance universal service. Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and non-discriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State.

Thus, this subsection does not grant the Commission authority to create the IUSF,

but instead provides that *if* states establish universal funding mechanisms, those funding mechanisms must comply with the FCC's rules. In light of our resolution of this issue on state statutory grounds, we need not address the significance of Subsection 254(f) on the question of the Commission's jurisdiction. Further, we need not address the import of 47 U.S.C. § 332(c)(3)(A) since the Wireless Carriers do not challenge the Commission's ability to impose requirements necessary to ensure the universal availability of service at affordable rates. *See* 47 U.S.C. § 332(c)(3)(A) ("Nothing in this subparagraph shall exempt providers of commercial mobile services ... from requirements imposed by a State commission on all providers of telecommunications services necessary to ensure the universal availability of telecommunications service at affordable rates.")

late and adopt rules and policies as will permit the Commission, in the exercise of its expertise, to regulate and control the provision of telephone services to the public in an increasingly competitive environment, giving due regard to the interests of consumers and the public and to the continued availability of universal telephone service.

Ind.Code § 8–1–2.6–1.

Indiana Code section 8–1–2.6–3, "Regulatory procedures or generic standards; rules; orders," provides as follows:

Notwithstanding any other statute, the Commission may:

(1) on its own motion;

(2) at the request of the utility consumer counselor;

(3) at the request of one (1) or more telephone companies; or

(4) at the request of any class satisfying the standing requirements of IC 8–1–2–54;

adopt rules or by an order in a specific proceeding provide for the development, investigation, testing, and utilization of regulatory procedures or generic standards with respect to telephone companies or services. The Commission shall adopt the rules or enter an order only if it finds, after notice and hearing, that the regulatory procedures or standards are in the public interest and promote one (1) or more of the following:

(1) Telephone company cost minimization to the extent that a telephone company's quality of service and facilities are not diminished.

(2) A more accurate evaluation by the Commission of a telephone company's physical or financial conditions or needs, as well as a less costly regulatory procedure for either the tele-

phone company, its consumers, or the Commission.

(3) Development of depreciation guidelines and procedures that recognize technological obsolescence.

(4) Increased telephone company management efficiency beneficial to consumers.

(5) Regulation consistent with a competitive environment.

■ The Wireless Carriers now assert that Indiana Code section 8–1–2.6–1 is a "legislative declaration of general policy" or mere preamble to the Code sections that immediately follow and, as such, does not enlarge or confer jurisdiction on the Commission to create an IUSF. (Verizon's Br. p. 13). This court has previously determined that a preamble is not an essential or effective part of an act. *Hobbs v. State*, 451 N.E.2d 356, 359 (Ind.Ct.App. 1983) (citation omitted). A preamble may be considered in ascertaining legislative intent in construing an ambiguous statute, but it is not controlling. *Id.* (citing *Besozzi v. Ind. Employment Sec. Bd.*, 237 Ind. 341, 146 N.E.2d 100 (1957)).

The Wireless Carriers also dispute the applicability of Section 3 because they are "aware of no legal authority under which a subsidy fund like the IUSF can be considered a 'regulatory procedure' or 'generic standard.'" (Verizon's Br. p. 15). Had the General Assembly intended for the Commission to have the authority to create funding for a universal service, they continue, the General Assembly would have explicitly included that in Section 3.

■ The Settling Party Appellees, however, challenge the Wireless Carriers' characterization of Section 1 as a mere preamble, writing that Section 1 is, instead, "a directive to the Commission in determining how and when it should proceed under the remaining provisions of the

[ARS]." (Settling Party Appellees' Br. p. 30). Further, the Settling Party Appellees contend that explicit reference to the creation of the IUSF is not necessary under the ARS and that the Wireless Carriers' analysis ignores the ARS's unique nature, which they contend is "to grant the Commission the flexibility necessary to preserve universal service in a competitive telecommunications environment." (Settling Party Appellees' Br. p. 25). In support of this contention, they cite to *Indiana Bell Telephone Co., Inc. v. Office of Utility Consumer Counselor*, 717 N.E.2d 613, 622 (Ind.Ct.App.1999), *reh'g granted in part*, 725 N.E.2d 432 (Ind.Ct. App.2000), where this court wrote as follows:

> [T]he Commission proceeded under the [ARS], which does not by its language specifically grant ratemaking authority to the Commission. Any Commission authority to change a telephone's utility rates using the [ARS] must derive from Ind.Code § 8–1–2.6–3, which gives the Commission authority to develop and use alternative 'regulatory procedures or generic standards' with respect to telephone companies or services.

Their argument, then, is that just as the ARS does not explicitly mention ratemaking but was nonetheless found to have provided the Commission with the necessary authority to change a telephone utility's rates, so too does the ARS confer on the Commission the necessary authority to create the IUSF. We agree.

When interpreting a statute, the foremost objective is to determine and effectuate legislative intent. *In re K.B.*, 793 N.E.2d 1191, 1197 (Ind.Ct.App.2003). Thus, courts must consider the goals of the statute and the reasons and policy underlying the statute's enactment. *Id.* A statute's meaning and interpretation are to be ascertained not only from the phraseology of the statute but also by considering its nature, design, and the consequences that flow from the reasonable alternative interpretations of the statute. *Id.* Statutes relating to the same general subject matter are *in pari materia* and should be construed together so as to produce a harmonious statutory scheme. *Id.*

The Commission's purpose is to ensure that public utilities provide constant, reliable, and efficient service to its customers, the citizens of this state. *Office of Util. Consumer Counselor v. Pub. Serv. Co. of Ind., Inc.*, 463 N.E.2d 499, 503 (Ind.Ct. App.1984). In 1985, the legislature enacted the ARS to enable the Commission to deal with an increasingly competitive environment for telephone services. *See Ind. Bell*, 717 N.E.2d at 616. Section 1 of the ARS states not only that "the maintenance of universal telephone service is a continuing goal of the Commission *in the exercise of its jurisdiction* [,]" but that "*the public interest requires that the Commission be authorized to formulate and adopt rules and policies* . . ., giving due regard to the interests of consumers and the public and to the continued availability of universal telephone service." Ind.Code §§ 8–1–2.6–1(1) and (5) (emphasis added). We simply cannot believe the legislature would expressly charge the Commission with ensuring the continuing availability of universal service without also conferring the authority necessary to effectuate that goal.

In the IUSF Order approving the Settlement Agreement, the Commission found that the establishment of an IUSF as set forth in the Phase II Settlement Agreement was in line with the Commission's legislatively-established goals under Section 1, was in the public interest, and would promote two of the objectives set forth in Section 3. As to the latter, the Commission found specifically that the IUSF's creation was "consistent with a

competitive environment" and that approval of the Phase II Settlement Agreement would "provide an additional mechanism to the Commission and assist [the Commission] in more accurately evaluating a telephone company's physical or financial conditions or needs, pursuant to a less costly regulatory procedure." (Wireless Carriers' App. p. 54) (citing Ind.Code §§ 8–1–2.6–3(2) and (5)). We owe no deference to the Commission's jurisdictional determination; nonetheless, we find that the Commission did not err in concluding that it had the requisite statutory jurisdiction to create the IUSF pursuant to the ARS.

## II. *Substantial Evidence*

Next, the Wireless Carriers contend that the IUSF Order lacks findings of fact supported by substantial evidence. Specifically, the Wireless Carriers contend that the proponents of the IUSF have "put forth virtually no evidence of the type required by law[,]" such as analyses or quantitative studies comparing the cost of providing universal service with associated revenues, to support their case that an IUSF is necessary to achieve universal service objectives. *See Lincoln Utils.*, 784 N.E.2d at 1077. The RLEC Appellants also challenge the sufficiency of supporting evidence, contending that the IUSF Order relies upon exhibits that were later revised and contains no specific findings with regard to the Benchmark Rates or the mandatory pass-through of the IUSF surcharge. We consider these contentions in turn.

### A. *Standard of Review*

This court's standard of review on an appeal from a final decision, ruling, or order of the Commission is well settled. Our review is limited to whether the agency based its decision on substantial evidence, whether the agency's decision was arbitrary and capricious, and whether it was contrary to any constitutional, statutory, or legal principle. *PSI Energy, Inc. v. Ind. Office of Util. Consumer Counsel*, 764 N.E.2d 769, 773 (Ind.Ct.App.2002), *reh'g denied, trans. denied.* We are not allowed to conduct a trial *de novo*, but rather, we defer to an agency's fact-finding, so long as its findings are supported by substantial evidence. *Id.* (citation omitted).

Pursuant to Indiana Code section 8–1–3–1, our review of an order of the Commission is two-tiered: we determine whether the Commission's decision contains specific findings on all of the factual determinations material to its ultimate conclusions, and we determine whether there is substantial evidence in the record to support the agency's basic findings of fact. *See id; see also Lincoln Utils., Inc. v. Office of Util. Consumer Counselor*, 661 N.E.2d 562, 564 (Ind.Ct.App.1996), *reh'g denied, trans. denied.* Basic findings of fact are important because they enlighten the reviewing court as to the agency's reasoning process and subtle policy judgments and allow for a rational and informed basis for review, which lessens the likelihood that a reviewing court would substitute its judgment on complex evidentiary issues and policy determinations better decided by an agency with technical expertise. *PSI Energy*, 764 N.E.2d at 773 (internal quotations omitted). Requiring an agency to set forth basic findings also assists the agency in avoiding arbitrary or ill-considered action. *Id.* (internal quotation omitted). To determine whether there was substantial evidence sufficient to support the agency's determination, we must consider all evidence, including evidence that supports the determination as well as evidence in opposition to the determination. *Id.* at 773–74. A reviewing court may set aside agency findings of fact only when the court determines, after a review of the entire record, that the agency's decision clearly lacks a reasonably

sound basis of evidentiary support. *Id.* at 774 (internal quotation omitted).

■ In addition, this court determines whether the Commission's order is contrary to law, that is, whether the order is the result of considering or failing to consider some factor or element that improperly influenced the final decision. *Lincoln Utils.*, 661 N.E.2d at 564. We have previously explained that a decision is contrary to law when the Commission fails to stay within its jurisdiction and abide by the statutory and legal principles that guide it. *Ind. Office of Util. Consumer Counselor v. Lincoln Utils., Inc.*, 784 N.E.2d 1072, 1075 (Ind.Ct.App.2003).

### B. *Findings of Fact Supported by Substantial Evidence*

■ First we consider the Wireless Carriers' assertion that the IUSF Order lacks findings of fact supported by substantial evidence because the Settling Parties proffered no substantive evidence supporting the creation of an IUSF. Essentially, the parties disagree about whether the undisputed loss of revenue to the RLECs leads necessarily to the conclusion that an IUSF is necessary, or whether additional supporting evidence in the form of tests and analyses is required to justify the creation of the IUSF. In the IUSF Order, the Commission's findings with respect to the IUSF (which come immediately after more than twenty-four pages of summarized testimony) read as follows:

> The record establishes sufficient facts that support our threshold finding that the public interest would be served in Indiana by the adoption of an IUSF. None of the evidence presented in this Cause disputed the underlying premise that mirroring of federally-driven carrier access charges has resulted and will continue to result in a loss of revenue to

RLECs. Relative to our largest LECs serving more densely populated markets, RLECs generally face higher costs to provide reasonably comparable local exchange telecommunications service. Without support, the customers of many RLECs would likely pay rates higher than what the Commission would consider to be fair, reasonable and affordable. Pursuant to the FCC's MAG Order, support for universal services should be explicit and available to all eligible telecommunications carriers on an equitable, non-discriminatory and competitively neutral basis.

(Wireless Carriers' App. p. 51).

Each of the Settling Parties sponsored witnesses who testified in support of the Settlement Agreement. Mitchell Proctor (Proctor), for instance, testifying on behalf of INECA member companies that entered into the Settlement Agreement, stated as follows in his rebuttal testimony:

> [T]he INECA companies basically have three intrastate recovery mechanisms available to them to generate the revenue necessary to maintain and operate existing network infrastructure and to deploy, maintain[,] and operate new and replacement infrastructure. Those revenue sources are intrastate access charges, local rates, and disbursement from Commission-established funds (*i.e.,* the Transitional DEM Weighing Fund ... and the Indiana High Cost Fund ..., both of which I note will be consolidated into the proposed IUSF). As the Commission is also aware, the RLECs traditionally have relied upon the revenue generated from intrastate access charges as an integral component of their overall rate designs and recovery levels. Thus, the revenue from intrastate access services (as well as the existing Commission-established funds) are integral components of the recovery

necessary for their overall universal service commitments to the communities they serve.

With this as background, therefore, due to the significant rate design alterations established by the FCC in its MAG Order, and reliance upon the FCC for recovery from the federal universal service fund, it is self-evident why a recovery mechanism such as the IUSF is required. Put another way, if the IUSF is not established, then either universal service will be compromised in the rural areas that are served by the INECA companies or basic local rates will be increased beyond those affordable and reasonably comparable to basic local rates in urban areas in Indiana, or even the possibility of both occurring.

(Transcript pp. 2154–55). Additionally, Cate Hegstrom (Hegstrom), testifying on behalf of AT & T, explained that as a requirement to receiving any distributions from the IUSF, an RLEC must successfully pass a "Qualification Test," which is a "streamlined 'earnings review' designed to prevent funds from being provided to a company that is already recovering its common line costs from some other internal source." (Tr. p. 1547). Ronald L. Keen (Keen), who testified on behalf of the Office of Utility Consumer Counselor, opposed the Settlement Agreement on several grounds, but nonetheless testified that "some type of State Universal Service Fund is necessary." (Tr. p. 2137).

The Wireless Carriers now argue that the proponents of the IUSF did nothing more than testify that the need for a universal fund is "self-evident," even though two witnesses testifying on behalf of parties opposed to the IUSF presented quantitative analyses comparing universal service revenues and costs in support of their conclusion that the IUSF is not needed for universal support. (T–Mobile's Br. p. 26).

But the reliability of the analysis offered by one of these witnesses, Gary J. Ball (Ball), an independent telecommunications consultant who testified on behalf of Wireless Carriers, was called into serious doubt by the rebuttal testimony of several of the Settling Parties' witnesses. Specifically, Proctor, testifying on behalf of INECA's member companies that entered into the Settlement Agreement, stated that Ball's analysis contained a number of inaccuracies and improper assumptions. James Stidham (Stidham), testifying on behalf of SBC Indiana, also asserted that Ball's analysis suffers from "a very expansive view of revenue" as compared to a "a very narrow view of expenses[,]" in addition to a number of other inaccuracies, deficiencies, and false assumptions. (Tr. p. 2202). Cherylann Bush (Bush), also testifying on behalf of SBC Indiana, stated in her responsive testimony that Ball's analysis was flawed in several respects, such that it appeared to her as if "Ball [was] manipulating numbers, without correct policy analysis, to promote the position of the Wireless Carriers that an IUSF is not needed." (Tr. p. 2295).

Next, the Wireless Carriers cite to *Lincoln Utilities*, 784 N.E.2d 1072, where this court reversed an order of the Commission after determining that the parties had put forth virtually no evidence *of the kind required by Indiana Code section 8–1–2–6*, the statute that regulates how the Commission values public utilities, to support the Commission's finding that a particular purchase price of a water utility company was reasonable. *See* Ind.Code § 8–1–2–6. But the case before us is factually distinguishable, as it does not involve the valuing of public utilities, and thus, Indiana Code section 8–1–2–6 is inapplicable.

■ We note that the Commission may properly accept the opinion of one expert over another. *See Office of Util. Consum-*

*er Counselor v. Citizens Tele. Corp.*, 681 N.E.2d 252, 258 (Ind.Ct.App.1997) ("The [Commission] did not err in accepting testimony by Lawrence and rejecting the OUCC's evidence regarding cost of equity."). Thus, the Commission was entitled to accept the opinion of those experts who testified in favor of the IUSF over the opinion of those, such as Ball, who testified that the IUSF is not needed for universal support. In this case, the Commission determined that substantial and undisputed evidence of the RLECs' revenue loss compelled the conclusion that the creation of the IUSF was necessary in order to provide explicit, competitively neutral support for universal service. The Commission also found that requiring a rate case for each RLEC as a condition precedent to receiving disbursements from an IUSF would be "unnecessary and counterproductive." (Wireless Carriers' App. p. 59). However, the evidence established that each RLEC must pass the Qualification Test prior to receiving IUSF disbursements; in the IUSF Order, the Commission found that the Qualification Test will actually reduce the level of Commission-approved recovery. In light of the foregoing, we find that there is substantial evidence in the record to support the Commission's findings of fact with regard to the IUSF Order.

### C. *Exhibits*

██ Next, we address the RLEC Appellants' contention that the IUSF Order violates the law because it relies upon "incorrect exhibits" that were subsequently revised. (RLEC Appellants' Br. p. 37). The Settlement Agreement was originally filed with the Commission on December 5, 2002. Attached to the Settlement Agreement were Attachments B, D, and E, which depict IUSF size over the period of RLEC rate rebalancing, IUSF disbursements to RLECs, rate shortfall analysis, and the transition schedule for rate rebalancing. Given the discovery of initial calculation errors, Attachments B, D, and E were revised on February 18, 2003, and admitted as part of the Settlement Agreement. The Commission, however, erroneously attached the original versions rather than the revised versions of Attachments B, D, and E to the IUSF Order.

The RLEC Appellants now complain primarily about Attachment B, which "incorrectly identifies that Daviess–Martin [County Rural Telephone Corporation] will not be eligible for any IUSF disbursements after calculation of the Qualifications Test." (RLEC Appellants' Br. p. 38). As explained by the Settling Party Appellees, the revised Attachment B shows that, in fact, Daviess–Martin, one of the RLEC Appellants, is eligible for IUSF distributions in the amount of $463,966 after applying the initial Qualification Test. The Settling Party Appellees now contend that the Commission's failure to attach the revised attachments was a mere oversight rather than a substantive error.

██ Indiana Trial Rule 60(A) provides as follows:

> Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the trial court at any time before the trial court clerk issues its Notice of Completion of Clerk's Record.... After the filing of the Notice of Completion of Clerk's Record, such mistakes may be so corrected with leave of the court on appeal.

A Trial Rule 60(A) motion is not to be used for the purpose of correcting errors of substance. *Keybank Nat'l Ass'n v. Michael*, 770 N.E.2d 369, 375 (Ind.Ct.App. 2002) (citation omitted), *trans. denied.* "Clerical error" in this context has been defined as a mistake by a clerk, counsel,

judge, or printer that is not a result of judicial function and cannot reasonably be attributed to the exercise of judicial consideration or discretion. *Id.*

Here, the record shows that the revised attachments—Attachments B, D, and E, all of which clearly state "Revised 02–18–03"—were admitted into evidence as part of the Settlement Agreement at the evidentiary hearing. (Tr. pp. 1764, 1769, 1770). Each of these attachments, as originally filed, had been labeled "Subject to Verification and Correction." (Tr. pp. 1797, 1802, 1804). Moreover, the text of the Settlement Agreement itself did not change, and the actual IUSF distributions are to be based on the revised calculations resulting from the Qualifications Test. We agree, therefore, with the Settling Party Appellees that the Commission's failure to attach the revised Attachments B, D, and E to the IUSF Order was a mere error arising from oversight rather than an error of substance. *See Keybank Nat'l Ass'n,* 770 N.E.2d at 375. As such, we grant leave and remand for the Commission to correct the oversight pursuant to Trial Rule 60(A).

### D. *Benchmark Rates*

■ Next, the RLEC Appellants contend that the Benchmark Rates established by the Settlement Agreement and approved by the IUSF Order lack a reasonably sound basis of evidentiary support. Specifically, the RLEC Appellants assert that there is no evidence demonstrating that the Benchmark Rates are just, reasonable and affordable, and reasonably comparable to urban rates. We cannot agree.

In the Telecommunications Act of 1996 ("TA–96"), Congress charged the FCC and the states with ensuring that "universal service is available at rates that are just, reasonable, and affordable." 47 U.S.C. § 254(i).[7] TA–96 further provides:

> Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services . . . that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas.

47 U.S.C. § 254(b)(3). In his direct testimony on behalf of SBC Ameritech, Stidham stated that "just" means " 'fair' to both purchaser and seller." (Tr. p. 1712). Stidham also testified that " 'reasonable' should be defined to mean capable of being defended on a rational basis consistent with economic and market principles[,]" and that "[t]he plain meaning of the term 'affordable' is to manage or to bear without serious detriment or to be able to bear the cost of." (Tr. p. 1712).

In the IUSF Order, the Commission stated that "a determination of '[B]enchmark [R]ates' is essential for any 'rebalancing' of the RLECs' rates associated with the creation of an IUSF." (RLEC Appellants' App. p. 49). Ultimately, the Commission approved Benchmark Rates of $17.15 per month for residential basic service and $23.60 per month for single-line business basic service. The Commission also noted, however, that the evidence and proposals submitted by those parties opposed to the Benchmark Rates established by the Settlement Agreement varied widely. For instance, Ball, testifying on behalf

---

7. The Commission adopted the principles and standards for implementation set forth in TA–96 § 254(b) in a 1998 Order: *Re Access Charge Reform and Universal Service Reform,* Cause No. 40785, "Affordability and Comparability Order," 1998 WL 999983 (Ind. U.R.C.) (September 16, 1998).

of Wireless Carriers, proposed a Benchmark Rate of $27.17; Thomas Long (Long), testifying on behalf of Northwestern Indiana Telephone Company, proposed a Benchmark Rate of $14.50; Robert E. Lowes (Lowes), testifying on behalf of the Clay County, testified that he believes the Benchmark Rates proposed by the Settlement Agreement are too high; and Sandra S. Ibaugh (Ibaugh), testifying in opposition to the Settlement Agreement on behalf of Smithville, Daviess–Martin, and Rochester, also stated that the Benchmark Rates were too high because, according to her analysis, the adjusted average residential basic local service rate is $13.06 per month.[8] Ibaugh conceded, however, that "rates may be determined by less than scientific methods; therefore, the Settling Parties' agreement on a Benchmark BLS [R]ate as just, reasonable[,] and affordable probably should not be viewed as inherently flawed." (Tr. p.2075).

In his rebuttal testimony, Proctor summarized as follows:

> Testimony was filed by eight non-settling parties. Only three of those parties proposed a specific [B]enchmark [R]ate different from that proposed by the Settlement Agreement.... The S[ettlement] A[greement] [B]enchmark [R]ates are about the mid-range of the only other proposals. The INECA companies believe the extremes, ambiguities, and in some cases, silence of the non-settling parties' testimony on this issue, taken as a whole, only demonstrates the reasonableness of the compromise struck by the Settling Parties with respect to the [B]enchmark [R]ate levels. In the end, the compromise contained in the S[ettlement] A[greement] represents

the same type of judgment the Commission would need to exercise to establish a "[B]enchmark" rate that is reasonably comparable and just, reasonable and affordable.

(Tr. p. 2164).

Additionally, Bush testified at length as to SBC Ameritech's approach to determining appropriate Benchmark Rates. Generally, Bush explained the approach as follows: "First, the range of current local service rates both within Indiana and nationwide were reviewed. Second, the impact of this range of rates on a new IUSF and the RLEC customers was examined." (Tr. pp. 1817–18). Having conducted this analysis, Bush testified that $17.15 was less than the rates already being paid by certain end-user customers of some RLECs in Indiana. Further, Bush testified that, as shown in the FCC's *Telephone Trends*, consumers nationwide spent $35.00 on residential local exchange service in the year 2000; this figure supports the assertion that $17.15 is an affordable residential Benchmark Rate. As to whether the Benchmark Rates are reasonably comparable to urban rates, Bush testified that the RLECs' blended average residential basic service rate (based on the Benchmark Rates set forth in the Settlement Agreement) is $18.34, which is within 10% of the blended average urban rate for SBC Indiana, Verizon, and Sprint. Testimony supporting the appropriateness of the Benchmark Rates was also offered by Hegstrom, Stidham, and Alan I. Matsumoto (Matsumoto), who testified on behalf of Sprint.

The RLEC Appellants then contend that the Commission failed to analyze or discuss evidence concerning the necessity of

---

8. Ibaugh initially testified that the average residential basic local service rate of Ameritech, Verizon, and Sprint was $11.83, which seems to explain the Commission's assertion in the IUSF Order that the non-settling RLECs proposed a Benchmark Rate of $11.83, a fact the RLEC Appellants dispute in their brief.

using "calling scope" when evaluating the reasonable comparability of rural and urban Basic Service.[9] As the RLEC Appellants themselves assert, the record is replete with argument concerning calling scope, both supporting and dismissing its significance. Therefore, we conclude that there is substantial evidence in the record to support the Commission's specific findings and its conclusion that the Benchmark Rates proposed in the Settlement Agreement and approved by the IUSF Order are just, reasonable and affordable, and reasonably comparable to urban rates.

### E. *IUSF Surcharge*

 Finally, the RLEC Appellants contend that the IUSF Order contains no specific findings concerning the mandatory pass-through of the IUSF surcharge to end-user customers. The RLEC Appellants cite to federal USF rules and "competitive concerns" as the basis for their objection to the mandatory pass-through of the IUSF surcharge, established by Section 11 of the Settlement Agreement, which reads as follows:

> The IUSF shall be funded via a mandatory contribution requirement imposed upon all telecommunications carriers who provide intrastate retail telecommunications service in Indiana and receive revenues therefrom. Such contribution assessments shall be passed through as a percentage surcharge to the end user customers of such telecommunications carriers . . .

(RLEC Appellants' App. pp. 68–9). The RLEC Appellants now argue that a complete dearth of specific findings concerning the IUSF surcharge renders the IUSF Order arbitrary and that the Commission's approval of Section 11 should be set aside.

47 C.F.R. § 69.131 and § 69.158 set forth the relevant federal law on universal service end user charges. Specifically, these sections state that both non-price cap and price cap local exchange carriers may seek to recover their federal universal service contribution costs through a line item charge to end users. Ibaugh testified that "[o]ther types of telecommunications providers *may* elect to recover their universal service contribution costs through whatever legitimate cost recovery mechanisms they deem appropriate, as long as they do not 'over recover' their costs." (Tr. p.2088) (emphasis in original). On cross-examination, Ibaugh agreed that while the FCC has not required mandatory end user charges, the FCC's rules also do not prohibit states from imposing a mandatory pass-through of the surcharge to end users. Stidham, testifying in support of the Settlement Agreement, stated in his direct testimony that

> [t]his type of surcharge avoids the possibility of a carrier gaining an unfair competitive advantage by 'discounting' the cost of [its] service for [its] customers by not including the IUSF surcharge and this type of surcharge ensures that the contribution is explicit, rather than hidden in a customer's rate.

(Tr. p. 1717). Thus, there is evidentiary support in the record for the mandatory pass-through of the IUSF surcharge to end-users.

The RLEC Appellants argue, however, that the IUSF Order contains no analysis, findings, or explanations related to the issue of mandatory surcharge pass-through. The Settling Party Appellees respond to this argument by pointing to the following, which is located in the "Statutory Over-

---

9. In their brief, the RLEC Appellants explain that " '[c]alling scope' refers to the number of local access lines a customer may call within his/her local calling area on a toll-free basis." (RLEC Appellants' Br. p. 44).

view" section of the "Commission Analysis and Findings" portion of the IUSF order:

> Based on the foregoing analysis, we specifically find that it is within our legislatively-granted authority, and federal law, to consider and resolve the issues presented to us in this proceeding, *including the mechanism set forth in the Settlement Agreement for all telecommunications carriers that provide intrastate telecommunications services in the state of Indiana to contribute to the provision of universal telephone service regardless of whether or not they are parties to the Settlement Agreement.*

(RLEC Appellants' App. p. 45) (emphasis added). The Settling Party Appellees go on to state that although the term "mandatory pass-through surcharge" is not specifically mentioned in the Commission's findings, "it is clear that the IUSF surcharge, as part of the competitively neutral 'mechanism' set forth in the Settlement Agreement for funding the IUSF, was being addressed in the [IUSF] Order." (Settling Party Appellees' Br. p. 52).

In determining whether the agency based its decision on substantial evidence, our standard of review requires us to consider all evidence, including evidence that supports the determination as well as evidence in opposition to the determination. *See PSI Energy*, 764 N.E.2d at 773–74. Here, a more detailed factual finding by the Commission regarding the mandatory pass-through surcharge would have aided us in our review of the IUSF Order; nonetheless, we find that there is substantial evidence in the record to support the Commission's approval of the surcharge. In light of the foregoing, we cannot say that the IUSF Order lacks a reasonably sound basis of evidentiary support. *See id.* at 774.

### III. *Due Process*

Next, the RLEC Appellants put forth several arguments in an effort to demonstrate that the IUSF Order violated their due process rights. First, the RLEC Appellants contend that the IUSF Order violated their due process rights by altering a policy concerning allocation of costs for purposes of rate rebalancing without providing proper notice. Second, the RLEC Appellants assert that, in the IUSF Order, the Commission improperly relied upon its prior approval of a non-precedential settlement agreement from another case, which authorized an alternative form of regulation for SBC Indiana, in further support of its departure from existing cost allocation principles and rules. Third, the RLEC Appellants contend that the IUSF Order violates Indiana's prohibition against changing rates without proper notice and review. Finally, they assert that the IUSF Order is a violation of due process in that the Commission determined the rules for IUSF disbursements without providing notice and an opportunity for comment. We consider each of these contentions in turn.

### A. *Allocation of Rate Rebalancing Rules*

The RLEC Appellants first assert that the Commission violated their due process rights by altering its policy concerning the allocation of rate rebalancing costs without providing proper notice. In the Commission's first investigation into "any and all matters relating to access charge reform and universal service reform," Cause No. 40785, the Commission determined that § 254(k) of TA–96 required that universal service offerings shall bear no more than a reasonable share of the joint and common costs associated with the facilities used to provide those services, and approved rules to guide the

ILECs in their rate rebalancing efforts.[10] (RLEC Appellants' App. p. 139). The RLEC Appellants now contend that the Commission's orders under Cause No. 40785 applied originally to all Indiana ILECs, including RLECs; thus, the IUSF Order articulated a new policy when it applied those directives solely to federal price cap ILECs without giving the RLEC Appellants notice and an opportunity to be heard.

In its Order on Petitions for Reconsideration/Rehearing under Cause No. 40785 (Order on Reconsideration), which the Commission issued on January 20, 1999, in response to INECA's petition for rehearing of the "Access Charge Reform Order," the Commission clarified the applicability of its 254(k) directives, writing as follows:

> [W]e do not believe rehearing is necessary to clarify the December 9, 1998 Order. We find the Order should be clarified that *the Commission did not intend to include the INECA members, or any company other than the federal price-cap companies, in the statements regarding rate rebalancing or compliance proposals*[.] The rate compliance of the small companies will be addressed in future proceedings.

(RLEC Appellants' App. p. 258) (emphasis added).

In the IUSF Order, the Commission reiterated that the rate rebalancing principles and rules adopted in the "254(k) Order" were limited to federal price-cap companies:

> In addition, various non-settling parties asserted that the Settlement Agreement is fatally flawed because by eliminating the intrastate CCL access rate and not

replacing it with some other charge, the [interexchange carriers] would no longer be contributing to the cost of the local loop. This, they argue, would violate the Commission's prior order interpreting Section 254(k) of TA[-]96.[9]

---

[9] The Commission rejects the argument set forth by the [sic] some of the non-settling parties regarding our past interpretation of 254(k). In our Order on Reconsideration ("Order on Reconsideration") in Cause No. 40785 [1999 WL 236863] (*Ind. Util. Reg. Comm'n*, January 20, 1999), we specifically stated that "[t]he Commission did not intend to include INECA members, or any company other than the federal price-cap companies, in the statements regarding rate rebalancing or compliance proposal. *The rate compliance of the small companies will be addressed in future proceedings.*" *Id.* at 19 ([e]mphasis [in original] ). Our consideration of 254(k) issues, with respect to companies other than federal price cap companies, has not been previously considered by the Commission; does not violate our past directives with respect to 254(k); and may appropriately be considered and resolved in this proceeding as anticipated in our Order on Reconsideration.

(RLEC Appellants' App. p. 48).

In support of its position that the Commission's 254(k) directives originally applied to all Indiana ILECs, including RLECs, the RLEC Appellants state that throughout all phases of the investigation in Cause No. 40785, all providers of telecommunications services were named as Respondents and that participants filing direct testimony included interexchange carriers, non-rural and rural incumbent local exchange carriers, INECA, the OUCC, and certain consumer advocacy groups. We fail to see how this proves anything whatsoever about the applicability of the Commission's 254(k) directives.

---

**10.** The Commission's investigation under Cause No. 40785 ultimately resulted in three separate orders, which the RLEC Appellants refer to as the "40785 Trilogy." (RLEC Appellants' Br. p. 21). The 40785 Trilogy consists of the following: "Comparability and Affordability Order," issued on September 16, 1998; "254(k) Order," issued on October 18, 1998; and "Access Charge Reform Order," issued on December 9, 1998.

The RLEC Appellants argue additionally that "[t]he Record [in Cause No. 42144] contains several statements demonstrating the parties' common understanding about the general applicability of the 40785 Trilogy rate rebalancing principles to any ILEC" and that the Commission's statement in its Order on Reconsideration must be considered "as a whole within the 40785 Trilogy, 40785 Order on Reconsideration, and the Record developed in Cause No. 42144[.]" (RLEC Appellants' Br. pp. 25, 26). We are not persuaded.

Even assuming that somewhere within the thousands of pages the Cause No. 42144 Record comprises there are "statements" demonstrating that someone believed the 40785 Trilogy rate rebalancing principles applied to all ILECs, that obviously does not make it so. Moreover, we are not convinced by the RLEC Appellants' argument that the vast context within which the Commission's statement appears somehow affects its apparently plain meaning. Thus, we find that the RLEC Appellants' argument that the Commission altered its policy concerning the allocation of rate rebalancing costs without providing proper notice fails.

### B. *Settlement Agreement*

Next, the RLEC Appellants contend that the Commission improperly relied upon its prior approval of a non-precedential settlement agreement from another case that involved elimination of the intrastate CCL access rate. In the IUSF Order, however, the Commission wrote as follows:

Additionally, with respect to claims regarding compliance with Section 254(k) directives, *while not binding on our consideration of whether the proposed Settlement Agreement is lawful and in the public interest,* we note that we have previously found a settlement agreement by less than all the parties in another

proceeding to be lawful and in the public interest notwithstanding the fact that no CCL rate would continue to be charged by the affected LEC.

(RLEC Appellants' App. p. 37). Thus, the Commission explicitly denied that it considered the prior settlement agreement binding on its approval of the Settlement Agreement at issue in the case before us. Additionally, we find the RLEC Appellants' reliance on *Voigt v. Voigt,* 670 N.E.2d 1271 (Ind.1996), a case involving the modification of a spousal maintenance agreement, to be misplaced. Thus, we conclude that there is no merit to the RLEC Appellants' argument that the Commission violated their due process rights by improperly relying on a prior settlement agreement to reverse prior policy decisions.

### C. *Rate Making*

The RLEC Appellants next assert that the Commission violated their due process rights by increasing basic local service rates without providing the required notice and hearing and making the requisite findings. In *Indiana Bell,* 717 N.E.2d 613, this court stated that the Commission can change rates under either traditional ratemaking methodology or the Alternative Regulation Statute (ARS). Here, as in *Indiana Bell,* the Commission proceeded under the ARS, which does not by its language grant ratemaking authority to the Commission. *See Ind. Bell,* 717 N.E.2d at 622. Any Commission authority to change a telephone utility's rates using the ARS must derive from Indiana Code section 8–1–2.6–3, which gives the Commission authority to develop and use alternative "regulatory procedures or generic standards" with respect to telephone companies or services. *Id.*

The ARS contains safeguards that must be observed before the Commission can

override traditional utility regulation statutes and substitute alternative procedures or standards. *Id.* Relevant to the RLEC Appellants' due process claim is the requirement that before using or imposing an alternative standard, the Commission must provide notice of the alternative ratemaking or other standard it is considering adopting and then conduct a hearing on that alternative standard. *Id.* As to this notice and hearing safeguard, this court has stated:

> We interpret this statute as requiring the Commission to give notice of the specific alternative regulatory procedure it is considering with sufficient specificity to allow interested parties to present evidence and participate in a hearing on that procedure.

*Id.* at 623.

Here, the caption for Cause No. 42144 reads as follows:

> In the matter of the investigation on the Commission's own motion, under Indiana Code [section] 8–1–2–72, into any and all matters relating to the Commission's mirroring policy articulated in Cause No. 40785 and the effect of the FCC's MAG Order on such policy, access charge reform, universal service reform, and high cost or universal service funding mechanisms relative to telephone and telecommunications services within the state of Indiana.

(RLEC Appellants' App. p. 12). Thus, the Commission clearly provided notice of its intention to consider a variety of issues relating to rate reform and universal service funding mechanisms. Notice of the time and place of the evidentiary hearing on these issues was provided by publication as mandated by Indiana Code section 8–1–1–8.[11] Following this notice, the Commission conducted an evidentiary hearing, where all interested parties, including the RLEC Appellants, could be heard and present evidence. Particularly in light of the fact that all of the RLEC Appellants submitted evidence and actively participated in the evidentiary hearing, we find that their claim of a due process violation is without merit.

### D. *IUSF Disbursements*

■ Finally, the RLEC Appellants contend that the Commission violated their due process rights by determining the IUSF disbursement rules for second eligible telecommunications carriers (ETCs) without permitting an opportunity to comment. The Settling Party Appellees, however, assert that this issue is not ripe for appellate review because the Commission explicitly deferred resolution of this issue to future proceedings.

In the subsection of the IUSF Order entitled "Issues not Resolved by the Settlement Agreement," the Commission wrote that "[t]he Settlement Agreement . . . does not address disbursements asso-

---

11. In their reply brief, the RLEC Appellants contend that the Commission did not properly provide notice because it did not publish notice in "each county wherein rates and charges were affected." (RLEC Appellants' Reply Br. p. 17). But Indiana Code section 8–1–1–8 (emphasis added) states in relevant part that notice must be published in "one (1) publication appearing not less than ten (10) days prior to the date fixed for the hearing in two (2) newspapers of general circulation published in *one (1) county* wherein reside

patrons or customers of the public utility who might be affected by an order made by the [C]ommission pursuant to the hearing." Here, ten days prior to the date of the evidentiary hearing, the Commission published notice in newspapers in two different counties: the Indianapolis Star in Marion County, and the News Sentinel and Journal Gazette in Allen County. Thus, we find the statutory notice by publication requirements were satisfied.

ciated with additional telecommunications carriers being designated as ETCs within an RLEC's service area." (RLEC Appellants' App. p. 18). Later in the IUSF Order, the Commission wrote that

[c]ompeting proposals have been presented for resolving this issue. They range from adopting the existing federal policy of matching the level of disbursement received by the incumbent rural telephone company and providing that money to the second ETC, to *deferring this issue to proceedings to addressing second ETC status when this issue is presented to the Commission.* For the reasons provided below, we prefer the latter approach to this issue[.] ... Accordingly, we find that applications by second ETCs may appropriately be considered by the Commission *in a manner that allows us to undertake any applicable public interest review,* under the terms of the Settlement Agreement.

(RLEC Appellants' App. p. 54) (emphasis added). Thus, the record clearly shows that the Commission explicitly deferred resolution of this issue to a future proceeding—a proceeding initiated by a second ETC that is operating within an RLEC service area and seeking IUSF disbursements. Accordingly, we agree with the Settling Party Appellees that this issue is not ripe for appellate review.

### IV. *Public Interest*

■ Next, the RLEC Appellants contend that the Settlement Agreement approved by the IUSF Order is not in the public interest. Specifically, they argue that because the Office of Utility Consumer Counselor (OUCC) opposed the Settlement Agreement, "there are expectations that a higher burden of proof must be achieved ... in order to overcome the public interest deficiencies." (RLEC Appellants' Br. p. 36). We note at the outset that "settlement" carries a different conno-

tation in administrative law and practice from the meaning usually ascribed to settlement of civil actions in a court. *Citizens Action Coalition, Inc. v. PSI Energy, Inc.,* 664 N.E.2d 401, 406 (Ind.Ct.App.1996). While trial courts perform a more passive role and allow the litigants to play out the contest, regulatory agencies are charged with a duty to move on their own initiative where and when they deem appropriate. *Id.* Any agreement that must be filed and approved by an agency loses its status as a strictly private contract and takes on a public interest gloss. *Id.* Indeed, an agency may not accept a settlement merely because the private parties are satisfied; rather, an agency must consider whether the public interest will be served by accepting the settlement. *Id.* (citing C. Koch, Administrative Law and Practice § 5.81 (Supp.1995)).

The OUCC is mandated by statute to "have charge of the interests of the ratepayers and consumers of the utility." Ind. Code § 8–1–1.1–5.1(e). Accordingly, the OUCC has the statutory ability to "appear on behalf of ratepayers, consumers, and the public in ... hearings before the [C]ommission." Ind.Code § 8–1–1.1–4.1(a). Consumers that do not retain counsel to go before the Commission essentially have two levels of protection: the Commission's "watchdog role" as an administrative agency and the OUCC's statutory role as a consumer representative in actions before the Commission. *Citizens Action Coalition of Ind., Inc. v. N. Ind. Pub. Serv. Co.,* 796 N.E.2d 1264, 1268 (Ind. Ct.App.2003), *reh'g denied, trans. denied.*

The RLEC Appellants cite *PSI Energy,* 664 N.E.2d at 406, in support of the contention that "the [c]ourt has distinctly held that approval of a settlement by the [OUCC] is clear proof concerning the acceptance of a settlement agreement as in the public interest." (RLEC Appellants'

Br. p. 33). In *PSI Energy*, the Citizens Action Coalition of Indiana (CAC) sought to persuade this court that the Commission had erred in rejecting a supplemental settlement agreement submitted by the CAC and the OUCC because a settlement endorsed by these parties should be accorded a strong presumption of approval. *PSI Energy*, 664 N.E.2d at 405. This court disagreed, writing as follows:

> Although we recognize the strong public policy favoring settlement agreements, we reject the notion that the [C]ommission must accept an agreement endorsed by the OUCC without determining whether the public interest will be served by the agreement.

*Id.* Thus, the case clearly does not stand for the proposition that OUCC-endorsed agreements are presumed to be in the public interest, as the RLEC Appellants claim.

 It is undisputed that the policies favoring settlement agreements are "further enhanced" when one of the parties proposing the settlement is the OUCC. *In re Ind. Bell Tel. Co.*, Cause No. 42405, 2004 WL 2309824, at * 20 (Ind. U.R.C. June 30, 2004). But when the OUCC opposes a settlement agreement, as is the case here, it does not follow that the OUCC's opposition amounts to conclusive evidence that the agreement is not in the public interest or that the Commission has to meet some "higher standard" in order to show that the agreement is in the public interest, as the RLEC Appellants contend. (RLEC Appellants' Br. p. 33). According to the Indiana Administrative Code, settlement agreements by some or all of the parties to a proceeding that are filed with the Commission must be supported by "probative evidence." 170 IAC 1–1.1–17(d). Although "probative evidence" is not defined, the Commission generally "may approve a settlement agreement if it

is supported by substantial evidence, and the Commission finds it to be in the public interest." *In re Ind. Bell Tel. Co.*, Cause No. 42405, at * 19 (Ind. U.R.C. June 30, 2004). Thus, we are not persuaded by the RLEC Appellants' argument advocating for a different, higher standard.

Finally, the RLEC Appellants assert that the Commission failed to provide specific findings to support its conclusion that the Settlement Agreement is in the public interest. Indiana Code section 8–1–2.6–2 provides in pertinent part:

> (b) In determining whether the public interest will be served, the [C]ommission shall consider:
>
>> (1) whether technological change, competitive forces, or regulation by other state and federal regulatory bodies render the exercise of jurisdiction by the commission unnecessary or wasteful;
>>
>> (2) whether the exercise of commission jurisdiction produces tangible benefits to telephone company customers; and
>>
>> (3) whether the exercise of commission jurisdiction inhibits a regulated entity from competing with unregulated providers of functionally similar telephone services or equipment.

In a past order, the Commission wrote that when reviewing a settlement agreement, it considers the following in determining the public interest:

> the impact of a matter upon all kinds of customers in all parts of the service area—low, middle and high income customers; high and low volume customers; rural and urban customers; residential as well as business customers; and retail as well as wholesale customers. In addition, the public interest includes the interest of the utility, its stakeholders, and the State as a whole. Our evaluation of the public interest rec-

ognizes that the public interest changes from time to time, and that the State's interests may be more comprehensive and take a longer range view than any of the parties' interests. In the context of settlement, the public interest also concerns compromise and balanced resolution. Finally, in the context of alternative regulation, the public interest is defined by the [l]egislature in the Alternative Regulation Statute, Ind.Code § 8–1–2.6–2.

*In re Ind. Bell Tel. Co.*, Cause No. 42405, * 20 (Ind. U.R.C. June 30, 2004).

Here, the Commission made numerous references to the public interest throughout the IUSF Order. For instance, the Commission determined that "the establishment of an IUSF pursuant to the terms of the Settlement Agreement is just, reasonable, and in the public interest[,]" and found that "the continuation of mirroring, including mirroring the elimination of the CCL rate elements for interstate access purposes is reasonable, lawful and in the public interest." (RLEC Appellants' App. pp. 46, 48). The Commission also found that specific sections of the Settlement Agreement are in the public interest, writing "we specifically find that the transition period in Sections 9 and 10 ... for the establishment of the [B]enchmark [R]ates and the minimum rate levels to be achieved through rate rebalancing provided thereunder are in the public interest[,]" and "we find that Section 20 ... is an appropriate mechanism to be utilized together with the Qualification Test to determine IUSF disbursement levels and is in the public interest." (RLEC Appellants' App. pp. 50, 52). Therefore, we cannot agree with the RLEC Appellants that the Commission failed to provide specific findings to support its conclusion that the Settlement Agreement is in the public interest. *See PSI Energy*, 764 N.E.2d at 773.

### V. *Federal Law*

■ Last, the RLEC Appellants contend that the IUSF Order does not meet the requirements of TA–96 § 245(b)(5) and (f), which mandate that state regulations or mechanisms adopted to provide for universal service must be "specific, predictable[,] and sufficient." *See* 47 U.S.C. § 254(b)(5), (f). The RLEC Appellants now argue that the IUSF Order provides for universal service funding that is *per se* insufficient because the size of the IUSF was calculated upon "historical revenue losses to RLECs" even though "new E[ligible] T[elecommunications] C[arrier]s will be able to draw from the [IUSF] absent a showing of need ...." (RLEC Appellants' Br. pp. 46, 47). We disagree.

Within the IUSF Order, the Commission specifically found that eligibility for IUSF disbursements is not limited to RLECs. However, the Commission also deferred the issue of IUSF disbursements to non-RLEC telecommunications carriers, indicating that ETCs' applications will be undertaken "in a manner that allows [the Commission] to undertake any applicable public interest review, under the terms of the Settlement Agreement." (RLEC Appellants' App. p. 54). Thus, a new ETC must demonstrate eligibility in order to receive any IUSF disbursements.

With regard to the "sufficiency" requirement, the Commission provided as follows:

We find there may very well be instances in which the disbursements from the IUSF will not be sufficient to meet the Commission's public interest responsibilities for ensuring appropriate investment in and operation and maintenance of the public switched telephone network in rural areas of our state. A supplemental mechanism is essential to address special circumstances on an expedited basis with sufficient, but not excessive, fact finding

and relief if necessary. Section 20 provides the Commission with the opportunity and flexibility to deal with these circumstances as they occur and in a reasonable manner. Therefore, we find that Section 20 of the Settlement Agreement is an appropriate mechanism to be utilized together with the Qualification Test to determine IUSF disbursement levels and is in the public interest.

(RLEC Appellants' App. p. 41). Additionally, the IUSF Order sets forth specific directives for the selection of an Administrator, whose duties are to include the following:

> [T]he Fund Administrator shall file semi-annual reports with the Commission's Telecommunications division . . . which summarize the operations of the IUSF; the sufficiency of the surcharge; frequency of collection and distribution; administrative issues[,] and any recommendations the Oversight Committee may have.

(RLEC Appellants' App. p. 52). We conclude that the RLEC Appellants have not shown that the IUSF Order violates federal law.

### CONCLUSION

Based on the foregoing, we affirm the IUSF Order but remand so that the Commission may attach the revised attachments to the IUSF Order.

Affirmed and remanded in part.

ROBB, J., and CRONE, J., concur.