INDIANA BELL TELEPHONE COMPANY, INC., Verizon North, Inc., and Contel of the South, Inc., d/b/a Verizon North Systems, Appellants–Respondents,

v.

INDIANA UTILITY REGULATORY COMMISSION, Office of Utility Consumer Counselor, and Indiana Payphone Association, Appellees–Administrative Agency, Statutory Party and Petitioner.

No. 93A02–0410–EX–896.

Court of Appeals of Indiana.

Oct. 19, 2006.

Dale E. Sporleder, Indianapolis, IN, A. Randall Vogelzang, Vice President & General Counsel, Verizon North, Inc., Irving, TX, Attorneys for Appellant Verizon North Systems.

Brian D. Robinson, Indiana Bell Telephone Co., Inc., Peter J. Rusthoven, Teresa E. Morton, Barnes & Thornburg LLP, Indianapolis, IN, Attorneys for Appellant Indiana Bell Telephone Company, Inc.

Steve Carter, Attorney General of Indiana, David L. Steiner, Deputy Attorney General, Kristina Kern Wheeler, Indiana Utility Regulatory Commission, Indianapolis, IN, Attorneys for Appellee Indiana Utility Regulatory Commission.

George T. Patton, Jr., Nikki G. Shoultz, Bryan H. Babb, Peyton L. Berg, Bose McKinney & Evans LLP, Indianapolis, IN, Attorneys for Appellee Indiana Payphone Association.

## OPINION

BAKER, Judge.

Appellants-respondents Indiana Bell Telephone Company (SBC), Verizon North, Inc., and Contel of the South, Inc., d/b/a Verizon North Systems (Verizon) appeal the findings of the full board (Board) of the Indiana Utilities Regulatory Commission (IURC) in favor of appellee-petitioner the Indiana Payphone Association (IPA). Specifically, the Appellants argue that the Board erred in applying the New Services Test (the Test) to Verizon, in finding that Verizon did not take the subscriber line charge, also known as the end user common line charges (collectively, "Charges"), into account in determining its revenue requirement, in recognizing findings from a separate proceeding, in ordering the Appellants to refund the Charges,

in not limiting the refund of the Charges to two years, and in reducing the prospective payphone rates. In its appellee's brief, the IPA asserts that the IURC erred in failing to order SBC and Verizon to pay interest on the refund of the Charges.

## FACTS

The IPA is an organization of businesses that provide pay telephone service to the public by purchasing telephone lines and other services from local exchange companies like SBC and Verizon (collectively, "Locals"). In 1996, Congress passed the Telecommunications Act (the Act), which created a new regulatory scheme designed to "promote competition among payphone service providers and promote the widespread deployment of payphone services to the benefit of the general public" by replacing a state-regulated monopoly system with a federally-facilitated, competitive market. 47 U.S.C. §§ 251, 276.

In 1996, the Federal Communications Commission (FCC) issued a series of orders clarifying and implementing the Act. When presented with a matter from the Wisconsin Public Service Commission, the FCC took the opportunity to clarify how state commissions were to implement the Test (the Second Wisconsin Order). The Second Wisconsin Order, which was issued on January 31, 2002, noted the "longstanding precedent that [the FCC used] forward looking cost methodologies where [it] applied the [Test]." Appellee's Add., tab 2, para. 3. The Second Wisconsin Order also confirmed that rates for payphone service must comply with the Test, which allows the Locals to charge IPA only for the Locals' forward-looking costs. The Test is a cost-based test that sets the direct cost of providing the new service as a price floor and then adds a reasonable amount of overhead to derive the overall price of the new service. To this end,

forward-looking, direct cost methodologies, such as total service long-run incremental cost (TSLRIC) or total element long-run incremental cost (TELRIC) should be used to calculate direct costs. The Second Wisconsin Order also noted the FCC's requirement that the Charges must be deducted from payphone rates to avoid double recovery by the Locals. The FCC also noted that the Test was required statutorily only for Bell Operating Companies (BOCs), but encouraged states to apply the Test more broadly, "thereby extending the pro-competitive regime intended by Congress to apply to the BOCs to other [Locals] that occupy a similarly dominant position in the provision of payphone lines." Appellee's Add., tab 2, para. 42.

On April 15, 1997, the IPA filed the first proceeding with the IURC, in which the IURC approved rates and charges for the Locals' payphone services in compliance with the Test. In the first proceeding, the IPA argued that the Charges were not lawful. The IURC did not rule on this issue, instead noting that the Charges "are the subject of a separate docket before this Commission docketed as Cause No. 41100 [the second proceeding]...." SBC's App. p. 112. The second proceeding, in which the IPA alleged that the Locals unlawfully collected the Charges and therefore owed a refund to the IPA, had been filed during the pendency of the first proceeding. The Locals filed tariffs and charged payphone rates in accordance with the final orders in the first proceeding.

After the issuance of the Second Wisconsin Order, the IPA filed a new complaint with the IURC on October 10, 2002 (the third proceeding). The IPA asked the IURC to set new, reduced future payphone rates and to direct the Locals to refund with interest to IPA members the difference between the requested new

rates and the existing, tariffed rates approved by the IURC in the first proceeding, retroactive to April 1997, when the first proceeding was filed. The IURC found, "In light of the FCC's recent re-evaluation of the [Test] in [the Second Wisconsin Order], the Presiding Officers find that this is an appropriate time to review [the Locals'] rates." Appellee's App. p. 134.

On August 12 and 13, 2003, the IURC conducted an evidentiary hearing in the third proceeding. On September 29, 2004, the IURC issued its final order, finding:

1. SBC's rates for payphone access lines and features are hereby revised in accordance with the findings herein. SBC shall file tariffs in compliance with the findings within thirty (30) days of the date of the Order.

2. Verizon's rates for payphone access lines and features are hereby revised in accordance with the findings herein. Verizon shall submit proposed tariffs and supporting cost documentation in compliance with the findings within thirty (30) days of the date of the Order.

3. SBC's and Verizon's rates approved in [the first proceeding] should be adjusted for intrastate and or interstate subscriber line charges. Therefore, SBC and Verizon shall refund an amount equal to subscriber line charges assessed since April 15, 1997 to present. The refunds shall be issued within ninety (90) days of the date of this Order and shall be issued in the form of a lump-sum payment to each affected customer, and not in the form of a bill credit.

4. The IPA failed to prove that basic rates approved by the [IURC] in [the first proceeding] were unlawful and, with the exception of subscriber line charges, the IPA shall not be entitled to a refund of the difference between the rates approved in this Order and the rates approved in [the first proceeding].

5. This Order shall be effective on and after the date of its approval.

SBC's App. p. 40–41. The order made no mention of interest with the refund of the Charges. The IURC issued its final order on the second proceeding on the same day. On October 19, 2004, the Locals petitioned for reconsideration of the final order in the third proceeding, and on January 5, 2005, the petitions for reconsideration were deemed denied. The Locals now appeal.

### DISCUSSION AND DECISION

The Locals contend that the IURC erred in applying the Test to Verizon because it is not a BOC, in finding that Verizon did not take the Charges into account in determining its revenue requirement, in recognizing findings in the second proceeding regarding the issue of whether the Charges were lawful, in ordering the Locals to refund the Charges, in not limiting the refund of the Charges to two years in accordance with a prior FCC decision, and in reducing the prospective payphone rates. On cross-appeal, the IPA argues that the IURC erred in failing to order the Locals to pay interest on the refund of the Charges because the IURC is authorized to award interest.

### I. Standard of Review

■ The IURC is a fact-finding body with technical expertise to administer the regulatory scheme devised by the legislature. *U.S. Gypsum v. Ind. Gas Co.*, 735 N.E.2d 790, 795 (Ind.2000); Ind.Code § 8–

1-1-5.[1] The purpose of the IURC is to ensure that public utilities provide constant, reliable, and efficient service to the citizens of Indiana. *Ind. Bell Tel. Co., Inc. v. Ind. Util. Regulatory Comm'n*, 715 N.E.2d 351, 354 n. 3 (Ind.1999). Our Supreme Court succinctly set forth the standard of review of IURC decisions as follows:

> An order of the [IURC] is subject to appellate review to determine whether it is supported by specific findings of fact and by sufficient evidence, as well as to determine whether the order is contrary to law. On matters within its jurisdiction, the [IURC] enjoys wide discretion. The IURC's findings and decision will not be lightly overridden just because we might reach a contrary opinion on the same evidence.

*U.S. Gypsum*, 735 N.E.2d at 795. In order for this court to vacate the IURC's Order, the Locals must demonstrate that the order either lacks a factual basis or is contrary to law. *Cellco P'ship v. Ind. Util. Regulatory Comm'n*, 810 N.E.2d 1137, 1142 (Ind.Ct.App.2004).

### II.  Application of the Test to Verizon

█ Verizon argues that as a non-BOC, the IURC was without authority to apply the Test to its rates. The nondiscrimination safeguards in section 276 of the Act require only that the Test be applied to BOCs, like SBC. The Second Wisconsin Order noted that section 276 was enacted to "eliminate all discrimination between [BOC] and independent payphones and all subsidies or cost recovery for BOC payphones." Appellee's Add., tab 2, para. 2. Later in the Second Wisconsin Order, the FCC noted that it did not have a Congressional grant of jurisdiction over non-BOC Locals, but "[w]e do, however, encourage states to apply the [Test] to all [Locals],

thereby extending the pro-competitive regime intended by Congress to apply to the BOCs to other [Locals] that occupy a similarly dominant position in the provision of payphone lines." Appellee's Add., tab 2, para. 42. So while the FCC may be without authority to apply the Test to Verizon, state agencies like the IURC are encouraged to do so. The question then becomes whether the IURC has authority under Indiana law to apply the Test to Verizon.

The IURC's statutory authority to regulate intrastate telecommunications rates and charges stems from Indiana Code section 8-1-2-4, which states that "The charge made by any public utility for any service rendered or to be rendered either directly or in connection therewith shall be reasonable and just, and every unjust or unreasonable charge for such service is prohibited and declared unlawful." Under the traditional ratemaking methodology, the IURC must first find that a utility's existing rates are unjust and unreasonable; if it does, the IURC may then order just and reasonable rates to be charged in the future. *Ind. Bell Tel. Co. v. Office of Util. Consumer Counselor*, 717 N.E.2d 613, 621–22 (Ind.Ct.App.1999), modified on rehearing on other grounds, 725 N.E.2d 432 (Ind.Ct.App.2000).

Here, the IURC found Verizon's rates to be unreasonable and therefore adjusted them in the third proceeding. SBC's Br. p. 68, 70–72. The next step is to order a just and reasonable rate, which the IURC determined could be reached through the application of the Test. Verizon does not argue that it is not in a "similarly dominant position" to the BOCs, and all evidence points to the conclusion that it is, in fact, similarly dominant. Therefore, we cannot say that the IURC erred in applying the Test to Verizon.

---

**1.** Amended by 2006 Ind. Legis. Serv. P.L.   30–2006.

### III. Findings on the Charges

■ Verizon next argues that the IURC erred in finding that Verizon had not taken the Charges into consideration in determining its revenue requirement. Verizon challenges the following statement in the IURC's final order: "The evidence indicates that the total, jurisdictionally unseparated, cost of the local loop has not been reduced by the amount of the [Charges] for either SBC or Verizon, as required by the FCC." SBC's Br. p. 73.

In support of its contention that it did take the Charges into consideration, Verizon points us to Confidential Exhibit DLB–1. This exhibit was introduced during the testimony of Verizon's first witness, David Behrle. Tr. p. 98. However, the IURC found that "[t]he data used in Mr. Behrle's and Mr. Dye's testimony is not the type of cost information upon which we believe accurate rates could be based." SBC's Br. p. 67. The IURC then ordered Verizon to provide additional cost support for its rates, and Verizon produced seven exhibits in response. Verizon does not contend that any of these additional exhibits support its argument that it took the Charges into consideration in determining its revenue requirement. We will not substitute our judgment on complex evidentiary issues and policy determinations that are better decided by an agency with technical expertise. *Nextel West Corp. v. Ind. Util. Regulatory Comm'n,* 831 N.E.2d 134, 144 (Ind.Ct.App.2005). Because we will not substitute our judgment for the IURC's determination that Confidential Exhibit DLB–1 does not contain information that will yield an accurate result and because there appears to be no other evidence in the record that Verizon took the Charges into account, we do not find any error in the IURC's conclusion that Verizon had not done so.

### IV. Recognition of Findings in Second Proceeding

■ Verizon argues that the IURC erred in considering in the third proceeding its findings in the second proceeding regarding the Charges. Specifically, Verizon alleges that the IURC subsumed the issue of the Charges from the second proceeding into the third proceeding.

Verizon contends that the second proceeding is unrelated to the third proceeding because the second proceeding dealt only with the Charges from either 1984 or 1988 through April 15, 1997, but not thereafter. While it is true that in its motion for judgment on the pleadings, the IPA said that the charges were unlawfully collected between 1988 and April 15, 1997, it would be elevating form over substance to say that the Charges were not generally at issue. In the second proceeding, the IPA's complaint alleged that it was "entitled to a refund of all intrastate [Charges] imposed on them and collected by all [Locals] in Indiana." SBC's App. p. 354.

Furthermore, it is not uncommon or unlawful for the IURC to defer an issue from another related cause for resolution. We upheld a similar deferral of rate refund issues in *Indiana Gas Co., Inc. v. Office of the Utility Consumer Counselor,* 610 N.E.2d 865, 870–71 (Ind.Ct.App.1993). The IPA has consistently raised the issue of the lawfulness of the Charges throughout all three of the relevant proceedings at issue here. In the first proceeding, the IURC deferred the issue by noting that it would not address the subject of the Charges because they "are the subject of a separate docket before this Commission docketed as Cause No. 41100 [the second proceeding]...." SBC's App. p. 112. We find this language to be sufficient to leave open the final determination of the issue of the Charges pending resolution of the issues in the other proceedings. For the

sake of administrative economy, the IURC ruled once and finally on the issue in the third proceeding. We do not find error in its having done so.

### V. Refund of the Charges

The Locals next contend that the IURC erred in ordering a refund of the Charges. Specifically, they argue that a refund of the interstate Charges was not within the IURC's jurisdiction and that this action was effectively a retroactive rate reduction.

#### A. Jurisdictional Argument

■ Verizon contends, and the IURC does not dispute, that the IURC has jurisdiction only over certain intrastate—not interstate—regulated services provided under tariffs filed with the IURC in Indiana. *See G. Ittenbach Co. v. Cleveland, C.C. & St. L. Ry. Co.*, 97 Ind.App. 332, 181 N.E. 382 (1932). Verizon complains of a statement in the final order for the third proceeding, in which the IURC ordered that "SBC's and Verizon's rates approved in [the first proceeding] should be adjusted for intrastate and or interstate subscriber line charges." SBC's App. p. 41.

In evaluating the issue of intrastate rates charged for payphone services in the Second Wisconsin Order, the FCC stated:

Under the [Test], the BOC may not charge more for payphone line service than is necessary to recover from PSPs all monthly recurring direct and overhead costs incurred by BOCs in providing payphone lines. The forward-looking cost studies used to make these determinations are usually calculations of total costs, not jurisdictionally separated costs. *If an incumbent BOC files in its state tariff a charge that fully recovers these unseparated costs and also assesses on the PSP its federally tariffed [Charges], the BOC will over-recover its costs,* and the PSP

will over-pay in violation of the [Test] and the cost-based rates requirement of the *Payphone Orders.*

Appellee's Add., tab 2, para. 60 (emphasis added). In other words, where, as here, the TSLRIC or TELRIC study includes both interstate and intrastate costs, the Locals would recover those costs both through federal tariffs and through the intrastate rates. This is an impermissible double recovery that the Test seeks to avoid. So the IURC was not ordering a refund of interstate charges over which it had no jurisdiction, but was ordering the Locals to reduce an intrastate payphone charge by an amount equal to the federally-tariffed Charge. We do not find error in its having done so.

#### B. Retroactive Rate Reduction

■ We acknowledge that the IURC does not have authority to set rates retroactively; however, the grant of a refund does not necessarily amount to retroactive ratemaking. *Airco Indus. Gases v. Ind.-Mich. Power Co.*, 614 N.E.2d 951, 953 (Ind.Ct.App.1993). Because the IURC has only that power bestowed upon it by statute, the question is whether there is statutory authority that would allow it to order the refund of the Charges. Indiana Code section 8–1–2–68 states that when "the commission shall find any ... charges ... to be unjust, unreasonable, insufficient, or unjustly discriminatory, ... the commission shall determine and by order fix just and reasonable ... charges ... to be imposed, observed, and followed in the future." The IURC therefore has jurisdiction to set the rate of these Charges.

In support of its argument, SBC points us to *In re Petition for Expeditied Review of BellSouth Telecomms. Inc.'s Intrastate Tariffs for Pay-Telephone Access Servs.*, 2004 Fla. PUC, 2004 WL 1567321 (2004). In *BellSouth*, the Florida Commission ex-

plicitly rejected the view that the Second Wisconsin Order permitted a retroactive decrease of tariffed payphone rates set in prior commission proceedings. The Florida Commission stated, "the most significant factor in the determination of whether refunds may be ordered is the fact that the Commission's Final [payphone rate] Order was protested, but the protest was subsequently withdrawn and the Order went into effect as a final Order." *Id.*

■ While it is true that the first proceeding produced a final order regarding the rates to be charged, we have already determined that the Charges were not a part of that order. That being the case, the Locals were on notice that the Charges were still an open issue, unlike the charges at issue in *BellSouth*. The Locals were collecting the Charges in spite of the fact that they had not yet been set by the IURC, and it was therefore not retroactive ratemaking to order a refund of the Charges.

## VI. Two–Year Limitation on Refund

Verizon asserts that the IURC erred in ordering the Charges to be refunded back to April 15, 1997. Specifically, Verizon argues that the refund should be limited to two years, and this order provides for a refund of over more than eight years.

■ In *Communications Vending Corp. of Arizona, Inc. v. Citizens Communications Co.*, the FCC held that the period of time for refunds under the payphone provisions of the Act is limited to two years *prior to the filing of the complaint.* 17 F.C.C.R 24201, 24221–22 (2002). The IPA counters that only the FCC—not the IURC—is bound by this limitation. We

need not decide the merits of this argument though because the IPA first raised the issue of the Charges on April 15, 1997, in the first proceeding. As we have already found, the IURC deferred the issue from the first proceeding, and it was not decided through the other two proceedings until September 29, 2004. Thus, the issue of the Charges was raised in the complaint in the first proceeding, which was filed on April 15, 1997, and was pending until September 29, 2004. Assuming the limitation period applies here, the IURC had authority to provide a refund dating back to April 15, 1995. It was therefore within the province of the IURC to award the refund from April 15, 1997.

## VII. Prospective Rate Reduction

SBC next contends that the IURC erred in ordering a prospective reduction in its payphone rates. Specifically, SBC argues that the IURC erroneously based the rate reduction on evidence from another proceeding and that the IURC excluded SBC's spare capacity costs.[2]

### A. Evidence from Another Proceeding

■ In the order, the IURC noted that it had examined certain evidence that SBC had introduced in a separate proceeding (UNE Proceeding):

> [W]e have compared the TSLRIC costs for the elements at issue in this proceeding with comparable elements found in SBC Indiana's TELRIC studies [in the UNE Proceeding]. We find the cost support to be reasonably comparable, and thus, we will use the cost support provided by SBC Indiana as the basis for our analysis in this proceeding.

---

2. SBC also argued in its Appellant's Brief that the IURC used an ambiguous methodology in fixing the rates and that the order's conclusions were unsupported by adequate findings or substantial evidence. But SBC conceded in its Reply Brief that these two issues had been rendered moot by the Appellees' Briefs. SBC Reply Br. p. 17. Therefore, we will not address these issues.

SBC's App. p. 32. The IURC also directed that the 21.86% shared and common cost markup fixed in the UNE Proceeding for pricing SBC's unbundled network elements [UNE] would be used as the overhead loading percentage in setting the prospective payphone rates in this proceeding.

SBC argues that it was prejudiced by the denial of the opportunity to review the IURC's comparison. But we cannot see how that is the case. The IURC clearly stated in the order that it considered the TSLRIC cost studies submitted by SBC in this proceeding to be flawed in several respects. SBC's App. p. 32. For that reason, the IURC attempted to substantiate the validity of that TSLRIC study. And the IURC did ultimately use the TSLRIC study that SBC propounded in the present proceeding as the basis for its analysis here because it found the results to be valid based on the comparison. *Id.* Thus, the IURC did exactly as SBC hoped by submitting the evidence when it relied on the TSLRIC study, and SBC was not prejudiced by any comparison to the TELRIC study from the UNE Proceeding.

### B. Spare Capacity Costs

SBC avers that the IURC's rate-fixing methodology excluded from consideration the spare capacity costs. The TSLRIC study did not include spare capacity costs, and the IURC accounted for this omission by determining that the 21.86% shared and common cost markup fixed in the UNE Proceeding would be used as the overhead loading percentage. SBC notes that its spare capacity costs were not included in the overhead costs in the UNE Proceeding, but were instead listed as direct costs. Thus, SBC concludes that the spare capacity costs were wrongly excluded from consideration.

■■■■■ The IPA counters that its expert testified that the TSLRIC and TELRIC results may or may not be different.

Tr. p. 844. But IPA does not contend that the spare capacity costs were in fact included here. However, the IURC notes that we give great deference to its rate-making methodology. *Office of Util. Consumer Counselor v. Gary–Hobart Water Corp.*, 650 N.E.2d 1201, 1204 (Ind.Ct.App. 1995). The Test is a cost-based test that sets the direct cost of providing the new service as a price floor and then adds a reasonable amount of overhead to derive the overall price of the new service. Indiana Code section 8–1–2–4 requires that the rates set by the IURC be just and reasonable, not precise. As a court, we are "not concerned with the question of whether the rates or other orders of the commission are exactly those indicated by the evidence taken before the commission, nor with the question of whether they are the rates and orders which the court would have made...." *Pub. Serv. Comm'n of Ind. v. City of LaPorte*, 207 Ind. 462, 466, 193 N.E. 668, 670 (1935). SBC has not presented us with any argument or evidence as to why the prospective rate is unjust or unreasonable because of the exclusion of the spare capacity costs. As such, we will not second-guess the IURC's judgment in its ratemaking methodology.

### VIII. Cross–Appeal—Interest on Refund

On cross-appeal, the IPA asserts that it is entitled to interest on the ordered refund of the Charges. The IPA requested an award of interest at the administrative level, and the IURC acknowledged that request in its order. SBC's Br. p. 49. In support of its position, the IPA points to the third in a trilogy of cases—*Northern Indiana Public Service Company v. Citizens Action Coalition of Indiana*, 548 N.E.2d 153 (Ind.1989) ("*NIPSCO III*"). In *NIPSCO III*, the IURC had ordered NIPSCO to pay a refund of certain charges plus interest at the rate of 6%

from the date of the final amended order. On appeal, the Citizens Action Coalition (CAC) challenged the 6% interest rate. Our Supreme Court found that the IURC has the inherent authority to make an award with interest and determined that "the statutory rate set forth in 24–4.6–1–103, provides, in this instance, a reasonable gauge of a fair return on one's funds when held by another." *Id.* at 161.

At issue in *NIPSCO III* was whether the statutes creating the IURC had abrogated the statutory and common law right to receive interest on money owed. Our Supreme Court held the statutes had not, such that the IURC had the authority to award interest at the statutory rate of eight percent. *Id.* at 161. The *NIPSCO* court did not say that the IURC had discretion to decide whether to award interest with the refund. Rather, the question was "whether the ratepayers can obtain relief from the commission for the interest owed them or whether they will be forced to seek relief in a separate action at law." *Id.* at 160. Thus, the court was concerned with *how* the CAC was to receive the interest it had a right to receive:

> Given [the] rule that fully compensating a claimant demands that interest be paid where the amount of damage is readily ascertainable as of a particular time, it is apparent that, *a fortiori*, where the common law action is for an amount of money owed, interest is recoverable as damages since its amount is obviously more "readily ascertainable" than in an action where the damages sought are for injury to property. *It is clear then that, under common law, CAC could bring an action for the money NIPSCO owed them and receive, as part of its judgment, interest on the money withheld from the date of its payment and may also have a right to interest under I.C. 24–4.6–1–103. The amount paid here was clearly*

*ascertainable and is not in dispute. Whether CAC retains this right to interest under the funds held by NIPSCO depends on whether the enabling legislation that empowers the commission has abrogated this right.*

*Id.* (emphasis added). Thus, if the party requesting a refund from the IURC can demonstrate that "the amount of damage [was] readily ascertainable as of a particular time, . . . interest is recoverable as damages." *Id.* Just as a jury would not have discretion to decline to award such interest, neither would the IURC. *See id.*

Here, SBC and Verizon were ordered to refund the Charges. If the amount of the Charges was "readily ascertainable" and "not in dispute," *id.*, then the IURC was required to order SBC and Verizon to pay interest on those refunds from the collection date of the money to be refunded. We remand this cause, therefore, with instructions to determine whether the refund met these criteria and to enter an award of interest if appropriate.

The order of the IURC is affirmed in part and remanded with instructions to determine whether the amount of the Charges was readily ascertainable and not in dispute and to enter an award of interest if appropriate.

SULLIVAN, J., concurs.

MAY, J., concurs and dissents with opinion.

MAY, Judge, concurring and dissenting.

I must respectfully concur in part and dissent in part. I agree the IURC correctly applied the New Services Test to Verizon, correctly found Verizon had not taken the Subscriber Line Charges into account when determining its fees, and correctly examined evidence and set a prospective rate for SBC. Also, while not agreeing with the amount of the refund, I

concur in the analysis and remand for reconsideration of the availability of interest on the refund. However, I do not believe the issue of the Subscriber Line Charges was deferred from the first cause, such that the Commission in its order in this third proceeding could refund the charges retroactively to 1997. Accordingly I dissent from Sections IV, V.B., and VI of the majority's opinion and concur with the remainder.

The IURC has the authority to defer an issue from one proceeding to another, *see Indiana Gas,* 610 N.E.2d at 871, and as the majority correctly notes "it is not uncommon or unlawful for the IURC to defer an issue from another related cause for resolution." Op. at 363. However, I do not believe the facts herein are analogous to *Indiana Gas,* where we noted:

> [T]he initial order in GCA was designated as an "Order on Less than All Issues" and provided that, with respect to the return to be earned, "This issue will be addressed in a subsequent order." We hold that this language was sufficient to leave open the final determination of the rate for the affected period until resolution of the "return to be earned" issue and to give adequate notice to Gas Co. that that issue remained open. It was not necessary that the initial order recite specifically that it was subject to refund.

610 N.E.2d at 871.

Here, the October 6, 1999, order in the first proceeding, Cause No. 40830, notes the Subscriber Line Charges "are the subject of a separate docket before this Commission docketed as Cause No. 41100 [the second proceeding]. . . ." Op. at 363 (quoting Appellant's App. at 112). However, that order does not, as the majority asserts, "defer[ ] the issue" or decline to "address the subject of the Charges because" the Subscriber Line Charges were

the subject of the second proceeding. Op. at 363. Rather, the October 1999 Order in Cause No. 40830 provides:

> Interstate subscriber line charges are the subject of a separate docket before this Commission docketed as Cause No. 41100 wherein the IPA filed a complaint before the Commission based upon the Tenth Circuit Court of Appeals remand in *C.F. Communications Corporation et. al. v. Federal Communications Commission et. al.*

(Appellant's App. at 112.) There is no deferral language in that paragraph.

Instead, there is substantial language in that October 1999 order suggesting the issue was not deferred. First, the IURC called that order a *"FINAL ORDER."* (*Id.* at 106 (emphases in original).) In addition, the order provided:

> Therefore, we find that the *payphone rates submitted* by Ameritech and GTE, while including a substantial mark-up over direct costs, fall within the acceptable parameters determined by the FCC in its examination of payphone tariffs submitted by Bell Atlantic and GTE, and *should be approved, with one exception for each which we describe immediately below.*
>
> *The per message local usage charge of Ameritech and GTE do appear to be an exception.* In the case of Ameritech, the rate is $.05 per message, which constitutes a mark-up over the direct cost of providing the service that exceeds the defacto ceiling determined by the FCC (4.8 times direct cost). In the October 29, 1997, Order in CC Docket 97–140, the FCC found that the rate for an unbundled payphone service provided by GTE (in another jurisdiction) was excessive because it included a similarly high mark-up and GTE did not provide adequate cost support. Ameritech, in its reply testimony, justified the $.05 per

message rate based on the IURC's approval of it in Cause No. 38158 in 1987. However, in its October 29, 1997 Order in CC Docket 97–140, the FCC found that rates contained in state tariffs are not relevant under the new services test. (Order at paragraph 6)[.] Thus, Ameritech's per message rate for local usage does not appear to comply with the new services test. Similarly, GTE's per message rate for local usage includes a mark-up over the direct cost of providing the service which exceeds the ceiling established by the FCC.

In its Memorandum of June 18, 1999, the Commission's Staff recommended a per message local usage charge of $.0096 for Ameritech and $.014 for GTE. The Commission Staff indicates that such rates, which were developed based on the cost support date provided to the IURC, comply with the FCC's payphone orders and new services test. We find that Ameritech and GTE should be provided the opportunity to present alternative per message local usage charges for our further consideration in that such proposals should be accompanied by cost support and analysis. If Ameritech and/or GTE wish to present an alternative charge, they should do so by filing the proposed charge, cost support and analysis within 30 days from the date of this Order. In the event such alternative proposals are not made, the above described charges shall take effect, and refunds for the difference between such charges and the interim charges shall be made to the respective company's IPP customers.

[Findings regarding Sprint].

Ameritech, Sprint, and GTE should file revised tariffs consistent with this finding within thirty days of the date of

this Order. The Commission Staff, upon receipt and review of said revised tariffs, should approve said tariffs if they are determined to be in conformity with our findings herein.

[Finding regarding other incumbent local exchange carriers ("Locals") ].

IT IS THEREFORE ORDERED BY THE INDIANA UTILITY REGULATORY COMMISSION that:

1. Ameritech and GTE shall submit revised tariffs to incorporate the per message local usage charges reflected in Finding No. 5 herein within 30 days of the date of this Order; provided, however, that Ameritech and GTE may each propose alternative per message local usage charges accompanied with pertinent cost support and analysis within 30 days of the date of this Order for our consideration. To the extent any tariff ultimately approved by the Commission Staff for per message local usage charges reflects rates which are less than the interim rates approved by our October 15, 1997 Order, the difference shall be refunded to each company's IPP customers.

2. [Order regarding Sprint].

3. [Order regarding other Locals].

4. There shall be no further proceedings for Phase II of this Cause [regarding other Locals].

5. This Order shall be effective on and after the date of its approval.

(*Id.* at 112–15) (italics added; original emphasis removed). Nothing in those final paragraphs suggests the Commission left the Subscriber Line Charges open for determination in a later proceeding. Rather, it explicitly left open *only* the issue of the mark-up on the "per message local usage charge."[3] Accordingly, the October 1999

---

**3.** This conclusion is further supported by the

Commission's follow-up order that resolved

order did not put SBC and Verizon on notice that the Commission had left unsettled the issue of the Subscriber Line Charges, could revise the tariffs retroactive to 1997, and could order a refund of overcharges. *Cf. Indiana Gas,* 610 N.E.2d at 871.

Nor does the remaining procedural history of this case support an inference that all parties had notice the issue of all Subscriber Line Charges post–1997 had been deferred to Cause No. 41100. After the October 1999 order in Cause No. 40830, it appears none of these parties—IPA, Verizon or SBC—presented evidence or argument in Cause No. 41100 regarding the validity of the Subscriber Line Charges after 1997. Instead, that cause remained what it had always been, a challenge to pre–1997 Subscriber Line Charges. I find the parties' failure to raise this purportedly deferred issue incompatible with the Majority's determination the Commission had deferred the issue to Cause No. 41000.

the per message local use charge issue:

> In its Final Order of October 6, 1999 the Commission *resolved each matter pending in this proceeding, with the exception of the issue of the per message local use charge* applicable to Ameritech and GTE that is discussed and resolved by this Order; determined that there shall be no further proceedings in Phase II of this cause; and, reached the following additional conclusions on the issues.

(Appellant's App. at 119) (emphasis added).

That follow-up order also contains an example of deferral language the Commission could have used if it truly intended to defer from the first cause the issue of the Subscriber Line Charges: "Issues applicable to GTE regarding rates for Call Screening and International Toll charges, have not been resolved by this Cause and will be addressed and resolved under cause number 40857." (*Id.* at 123.) This suggests the Commission knows how to defer an outstanding issue to another cause number when it so intends.

**4.** The Respondents' *existing relevant rates* and charges for Independent Payphone Providers

In addition, on October 10, 2002, the IPA filed a new complaint with the IURC, Cause No. 42303, in which is asked the IURC to review and adjust the tariffs set for SBC, Verizon, and Sprint in Cause No. 40830 because the tariffs were improper under the New Services Test as clarified in the Second Wisconsin Order. The petition alleged:

> 8. Respondents' rates (established before the FCC's NST Order) fail to comply with the New Services Test because they: (a) do not use forward looking direct economic costs; (b) contain overhead allocations significantly exceeding the allocations for comparable services, such as unbundled network elements; (c) do not follow the New Services Test methodology in setting rates for usage services; and (d) *fail to take into account other sources of revenue, including EUCLs [also known as Subscriber Line Charges], resulting in double recovery of costs for Respondents.*[4]

*were established pursuant to IURC Order in Cause No. 40830 dated October 6, 1999* ("IURC Order") where the Commission found no federal basis to require Respondents to submit cost support for their payphone rates based on TSLRIC or TELRIC, and that payphone providers are not subject to pricing standards for unbundled network elements. (IURC Order at 6.) In the same Order, the IURC approved Respondents' overhead allocations, relying upon language from a 1997 FCC Order in CC Docket 97–140, stating that uniform overhead loading is not mandated provided that the loading methodology selected, as well as deviation from it, is justified. (IURC Order at 6.). Finally, the IURC found the payphone rates submitted by Respondents Ameritech and Verizon were "within acceptable parameters determined by the FCC in its examination of payphone tariffs submitted by Bell Atlantic and GTE." In support of this finding, the IURC relied upon the same 1997 FCC order, which found Bell Atlantic rates for unbundled payphone functionalities amounting to 3.4 times direct costs were reasonable, and other [Locals] rates that amounted to 4.8 times direct costs were reasonable.

9. The FCC NST Order clarifies the Wisconsin Order, and both Orders are binding on the IURC in this matter (except to the extent that the Wisconsin Order was modified by the FCC NST Order). Because the FCC did not completely uphold the Wisconsin Order and further clarified the applicable standards for rate-setting, the IPA requests this Commission set aside Respondents' existing rates and establish new rates consistent with the New Services Test as set forth in the FCC NST Order.

10. Because Respondents' rates were unlawfully set and do not comply with the FCC NST Order, IPA is further entitled to a refund, with interest, for excess rates paid by its members since 1997, by virtue of Respondents' failure to charge rates that comply with the New Services Test.

(Appellant's App. at 45–46) (footnote in original) (emphases added). The IPA's 2002 complaint explicitly states rates "were set" by the Commission in Cause No. 40830, and the IPA wanted new rates established. The IPA did not request the IURC enter a long-awaited final order in Cause No. 40830 and refund the overcharges they were permitted by the preliminary order.

All those facts lead me to conclude the IURC did not intend to defer, and the parties did not believe the IURC had deferred, the issue of Subscriber Line Charges after 1997 to Cause No. 41100. Accordingly, there was no issue from Cause No. 41100 for the IURC to defer to this Cause No. 42303,[5] and the IURC erred in this proceeding, Cause No. 42303, by ordering refunds retroactive to 1997.[6]

---

**5.** The order for Cause No. 41100 did contain language deferring the issue of post–1997 Subscriber Line Charges to this proceeding, Cause 42303:

> We find that EUCL charges, if any were inappropriately assessed to IPPs after the implementation of the Telecommunications Act of 1996, cannot be appropriately addressed in the instant proceeding due to the fact that the evidence and testimony addresses EUCL charges prior to the Telecommunication Act of 1996. We find that IPA's complaint regarding EUCL charges raised in 40830 is most appropriately addressed in Cause 42303, which considers IURC and FCC orders issued after the Telecommunications Act of 1996 and re-examines Cause 40830. This deferral of issues is consistent with the history of all the complaint cases filed in the history of the Commission regarding payphones. Cause No. 40830 deferred resolution of the EUCL/SLC issue to this cause. Subsequently, the filing of Cause No. 42303 subsumed the issue of EUCLs allegedly assessed post-TA '96.

(Appellant's App. at 349.)
However, as the IURC entered its order in Cause No. 41100 the same day it entered its order in this third proceeding, Cause No. 42303, I interpret that deferral language as a post-hoc justification by the IURC to permit it

to refund a greater portion of the tariffs set by the October 1999 order in Cause No. 40830. With the advantage of hindsight, and the FCC's clarification of the New Services Test in the Second Wisconsin Order, we can see the rates set in that October 1999 order erroneously permitted double recovery of Subscriber Line Charges. Nevertheless, the IURC may not retroactively correct that error. *See* Ind.Code § 8–1–2–68 ("the commission shall determine and by order fix just and reasonable rates, tolls, charges, schedules, or joint rates to be imposed, observed and followed in the future"). The IPA could have filed a direct appeal challenging the IURC's conclusion the "payphone tariffs submitted by Bell Atlantic and GTE ... should be approved, with one exception for ... [t]he per message local usage charge," (*id.* at 112), or the IPA could have done exactly what it did— wait until a new order by the FCC supported its argument and then file a new complaint with the IURC challenging the tariffs set in that October 1999 order.

**6.** Because my opinion is not the majority opinion, I need not determine the extent to which the IURC can order a refund without impermissibly ordering a "retroactive rate reduction" as discussed in Section V.B. Nor do I need to determine the impact of the two-

Therefore, I concur in part and dissent in part.

year limitation discussed in Section VI. Accordingly, I dissent without opinion as to those portions of the majority's opinion.