THE HOME TELEPHONE COMPANY OF PITTSBORO, INC. and Communications Corporation of Indiana, Appellants–Petitioners,

v.

VERIZON NORTH, INC., Contel of The South, Inc. d/b/a Verizon North Systems, MCI Communications Services, Inc. d/b/a Verizon Business Services, MCIMetro Access Transmission Services LLC d/b/a Verizon Access Transmission Services, Powertel/Memphis Inc. d/b/a T–Mobile, T–Mobile Central LLC d/b/a T–Mobile, Time Warner Telecom of Indiana, L.P., and Indiana Bell Telephone Company, Incorporated d/b/a AT & T Indiana, Appellees–Respondents,

and

Indiana Office of the Utility Consumer Counselor, Appellee–Intervenor.

No. 93A02–0804–EX–354.

Court of Appeals of Indiana.

March 31, 2009.

Transfer Denied July 16, 2009.

Andrea L. Hermer, James B. Chapman, II, Raegan M. Gibson, Indianapolis, IN, Attorneys for Appellants.

Jennifer L. Copland, William J. Champion III, Dickinson Wright PLLC, Ann Arbor, MI, Brian D. Robinson, Indianapolis, IN, Attorneys for Appellees.

Gregory F. Zoeller, Attorney General of Indiana, David Lee Steiner, Deputy Attorney General, Beth Krogel Roads, Indianapolis, IN, Attorneys for Intervenor.

**OPINION**

RILEY, Judge.

*STATEMENT OF THE CASE*

Appellants–Petitioners, The Home Telephone Company of Pittsboro, Inc. (Home) and Communications Corporation of

Indiana (CO) (collectively, Appellants), appeal an Order of the Indiana Utility Regulatory Commission (IURC), which is defended by Appellees–Respondents, Verizon North, Inc., Contel of the South, Inc. d/b/a Verizon North Systems, MCI Communications Services, Inc. d/b/a Verizon Business Services, MCIMetro Access Transmission Services LLC d/b/a Verizon Access Transmission Services, Powertel/Memphis Inc. d/b/a T–Mobile, T–Mobile Central LLC d/b/a T–Mobile, Time Warner Telecom of Indiana, L.P., and Indiana Bell Telephone Company, Incorporated d/b/a AT & T Indiana (collectively, Appellees). The IURC was granted leave to intervene.

We affirm.

## ISSUES

Appellants raise three issues on appeal, which we restate as follows:

(1) Whether the IURC abused its discretion when it held that Section 10 of the Phase II Settlement Agreement precluded the Variance requested by Appellants;

(2) Whether the IURC deprived Appellants of their due process rights by rendering a decision on matters outside Appellants' requested relief; and

(3) Whether the IURC abused its discretion when it required Appellants to modify their Qualification Test by excluding the impact of rate reductions that occurred in 2006.

## FACTS AND PROCEDURAL HISTORY

On March 17, 2004, the IURC approved the creation of the Indiana Universal Service Fund (IUSF), which was designed to promote universal telephone service in a competitive environment. The purpose of the IUSF is to ensure that consumers in all parts of Indiana have access to telecommunication and information services at rates reasonably comparable to those in urban areas. Because the cost of providing telephone service in rural areas is higher than the cost of providing telephone service in an urban setting, the IUSF is designed to offset the revenue losses of rural local exchange carriers (RLECs). These losses occur as a result of Indiana's policy of mirroring at the intrastate level the rates and rate structures of the applicable interstate carrier access charges established by the Federal Communication Commission (FCC) and the high cost of rural telephone service. Both Appellants provide telephone services in rural areas and are considered RLECs.

On December 27, 2001, the IURC initiated an investigation under Cause Number 42144 into issues regarding universal telecommunications service in Indiana. The investigation was divided into two phases. Phase I was designed to resolve those issues that needed to be resolved with respect to the IURC's practice of mirroring interstate access rates at intrastate level in light of the MAG Order [1] issued by the FCC on November 4, 2001. Phase II was designed to continue the investigation to address the remaining issues, including any appropriate issues identified by the parties involved in Phase I.

On May 29, 2002, the IURC issued an Interim Order approving a settlement agreement executed by some of the par-

---

1. The MAG Order is the abbreviated name for the Second Report and Order and Further Notice of Proposed Rulemaking, *In the Matter of Multi–Association Group (MAG) Plan for Regulation of Interstate Services of Non–Price Cap Incumbent Local Exchange Carriers and Interexchange Carriers,* CC Docket Nos. 00–256, 65–45, 98–166, FCC 01–304, 16 FCC Rcd. 19613, 2001 WL 1381097 (Nov. 8, 2001). *Nextel West Corp. v. Ind. Util. Regulatory Comm'n,* 831 N.E.2d 134, 158 (Ind.Ct.App. 2005), *reh'g denied, trans. denied.*

226

ties, including Appellants and several other telephone carriers, to the Phase I proceeding. The Phase I Settlement Agreement stated that the IURC's mirroring policy should continue "until such time as the [IURC] orders otherwise." *Nextel West Corp. v. Ind. Util. Regulatory Comm'n,* 831 N.E.2d 134, 138 (Ind.Ct. App.2005), *reh'g denied, trans. denied.* As an interim measure, however, the Phase I Settlement Agreement set forth a two-part formula designed to recover, at least in part, the "intrastate revenue reductions [that] have resulted from mirroring changes in the interstate access rate design associated with federal actions." *Id.* The parties agreed that the Phase I revenue recovery methods would remain in effect until implementation of an alternative method approved by the IURC in Phase II.

On March 17, 2004, the IURC issued an Order approving the Phase II Settlement Agreement as executed by certain parties to Phase II, including Appellants. The Phase II Settlement Agreement supports the IURC's continued mirroring of interstate access rates and rate structures at the intrastate level but also provides for the partial recovery of intrastate access rates. It provides in pertinent part as follows:

> The revenues from RLEC's intrastate access rates were negatively impacted by the FCC's MAG Order. As a result, the public interest will be served by providing for the RLEC's recovery, in part, of such intrastate revenue losses resulting from the continued mirroring of interstate access rates: (1) through the process of rate rebalancing by the establishment of "benchmark" residential and single-line business local exchange service rates for the RLECs that are reasonably comparable to rates for those services in urban areas, and which are just, reasonable, and affordable (the

"Benchmark Rates"); and (2) through the creation of [IUSF] to provide for recovery of (i) any remaining revenue shortfall that would continue to be otherwise sustained by the RLECs notwithstanding implementation of the Benchmark Rates, as herein provided, due to decreased intrastate access rates brought about by either the mirroring of the MAG's Order's rate design or (ii) the RLECs' costs of providing service not otherwise recovered through the revenues generated by the RLECs' local service and intrastate access rates.

*Id.* at 139–40. In addition, the Phase II Settlement Agreement established that RLECs seeking funding from the IUSF were required to meet a "Qualification Test" that set forth specific financial criteria and procedures demonstrating eligibility to receive funds. Specifically, the guidelines to the Qualification Test provide:

> The Qualification Test compared the RLEC's three-year average net operating income amount [for 2004, 2005, and 2006] against a net operating income cap, as calculated by multiplying the RLEC's three-year average rate base by 11.5%, determining the amount, if any, of calculated net operating income surplus for the RLEC. The calculated net operating income surplus amount was then multiplied by a net to gross multiplier to determine the amount of calculated revenue surplus for the RLEC. The calculated revenue surplus amounts directly reduced the RLEC's initial fund disbursement eligibility amounts.

(Appellants' App. p. 101). Pursuant to the terms of the Phase II Settlement Agreement, the Phase I Settlement Agreement was to remain in effect until the IURC approved and implemented the Phase II

Settlement Agreement through a final, nonappealable Order.

On March 17, 2004, following an evidentiary hearing, the IURC approved the Phase II Settlement Agreement. This Order was affirmed in all respects in *Nextel West Corp. v. Ind. Util. Regulatory Comm'n*, 831 N.E.2d 134 (Ind.Ct.App. 2005), *reh'g denied, trans. denied.* Through the Implementation Order, issued on June 13, 2007, the IURC designated October 1, 2007 as the Phase II Settlement Agreement's Implementation Date.

In January of 2006, Appellants petitioned the IURC for a temporary reduction in their rates for residential and business access lines. The IURC approved the rate reductions to be effective on April 1, 2006. As a result of these rate reductions, Appellants sustained revenue reductions from April 1, 2006 through December 31, 2006. On May 24, 2007, Appellants filed separate Petitions with the IURC seeking a Variance from the Qualification Test requirements of the Phase II Settlement Agreement that would allow them to recover from the IUSF lost revenues associated with these voluntary rate reductions in 2006. Specifically, they argued that the IUSF calculations did not adequately reflect their ongoing financial position due to the revenue reduction they sustained in 2006. As such, the Appellants requested the IURC to recalculate their IUSF distributions to include the full effect of those rate reductions on a normalized basis in accordance with Section 20 of the Phase II Settlement Agreement, which provides, in pertinent part, that

> Should events occur now or in the future or circumstances exist for an RLEC which require a variance from the strict application of the provisions of this Settlement Agreement, this Settlement Agreement shall not preclude any affected RLEC from petitioning the [IURC]

for supplemental consideration or requesting a variance from the IUSF calculations, processes and disbursements provided by this Agreement.

(Appellants' App. pp. 110–11).

On May 31, 2007, the IURC ordered that Appellants' Variance Petitions be re-filed, which the Appellants did on June 12, 2007. Following an evidentiary hearing, the IURC entered an Order on March 26, 2008, denying the Petitions. The IURC found that the Variance Petitions were inconsistent with the express language of Section 10 of the Phase II Settlement Agreement, which prohibits an RLEC from lowering current rates towards the Benchmark Rate and recovering the associated revenue loss from the IUSF.

Appellants now appeal. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

The IURC is a fact-finding body with technical expertise to administer the regulatory scheme devised by the legislature. *Ind. Bell Tel. Co. v. Ind. Util. Regulatory Comm'n*, 855 N.E.2d 357, 361 (Ind. Ct.App.2006), *trans. denied.* The purpose of the IURC is to ensure that public utilities provide constant, reliable, and efficient service to the citizens of Indiana. *Id.* Our supreme court succinctly set forth the standard of review of IURC decisions as follows:

> An order of the IURC is subject to appellate review to determine whether it is supported by specific findings of fact and by sufficient evidence, as well as to determine whether the order is contrary to law. On matters within its jurisdiction, the IURC enjoys wide discretion. The IURC's findings and decision will not be lightly overridden just because

we might reach a contrary opinion on the same evidence.

*U.S. Gypsum, Inc. v. Ind. Gas Co.*, 735 N.E.2d 790, 795 (Ind.2000).

## II. *Section 10 of the Phase II Settlement Agreement*

As an initial argument, Appellants contend that Section 10 of the Phase II Settlement Agreement was not in effect at the time of their request for a Variance and thus could not act as a bar to the Variance. Section 10 provides, in part

> In the event an RLEC's current rate for either residential or single-line business basic local exchange service is currently higher than the respective Benchmark Rate to be charged for such service, the RLEC may not lower its rate toward such Benchmark Rate and thereby recover from the IUSF the reduction in revenues resulting from such lowered rate.

(Appellants' App. p. 103).

■ However, Appellees and the IURC claim that as Appellants did not raise this argument before the IURC, they waived the issue for our review. *See, e.g., Grathwohl v. Garrity*, 871 N.E.2d 297, 302 (Ind. Ct.App.2007). We agree. Our review of the Variance Petition indicates that Appellants asserted that "[a]pproving this petition will not be contrary to the last paragraph of Section 10 of the Settlement Agreement which was intended to disallow automatic basic local rate rebalancing through further expansion of the IUSF." (Appellants' App. pp. 23 & 39). During the IURC's administrative hearing, Appellants focused their argument on the last segment of Section 10 and reiterated their assertion that the section "was intended to disallow automatic revenue-neutral downward basic local rate rebalancing via the IUSF;" they did not mention the Section's effective date. (Appellant's App. p. 8).

Therefore, as the Appellants failed to raise the question of Section 10's effective date before the administrative tribunal, they cannot now raise it for the first time on appeal. *See id.* As such, we find that they waived this particular issue for our review.

## III. *Due Process Rights*

■ Next, Appellants contend that they petitioned the IURC for a Variance from the Qualification Test calculations only so that Appellants' data would accurately reflect their revenue losses from the 2006 rate reductions. The Appellants now maintain that aside from this request and without giving notice, the IURC analyzed Appellants' submitted Qualification Test and required a recalculation of the Test to remove Appellants' 2006 rate reductions.

In their Petition for Variance, Appellants requested the IURC for relief from the requirements of the Phase II Settlement Agreement and a disbursement from the IUSF to offset their rate reduction. They submitted the Qualification Test as evidence of the disbursement amount they desired to receive. The IURC denied Appellants' request for a Variance. Because Appellants' Qualification Test was calculated by taking into account the rate reduction which was rejected by the IURC, the IURC's request to recalculate and resubmit the Qualification Test by omitting the rejected rate reduction is merely an extension of the IURC's decision. As stated by Appellees, "[t]he IURC can hardly be faulted in requiring Appellants to submit Qualification Tests consistent with the IURC's IUSF Order if they desired to receive [future] disbursements from the IUSF.... If Appellants did not want to submit Qualification Tests that complied with the IUSF Order, they were undoubtedly free to forego any subsidy from the fund." (Appellees' Br. pp. 19 & 20).

Therefore, as is clear from the record, Appellants received notice and attended an evidentiary hearing with regard to their Petition for Variance and were not deprived of their due process rights. Thus, we find that the IURC's action was a reasonable exercise of its discretion.

### IV. *Qualification Test*

■ Lastly, Appellants assert that the IURC promulgated a new rule retroactively when it required Appellants to recalculate their Qualification Test by omitting the rate reduction numbers and resubmit a new Qualification Test. As we concluded in the previous section, the IURC's requirement to resubmit a new Qualification Test which did not incorporate the rate reductions requested by Appellants through their Variance Petition is merely a logical extension of its denial of Appellants' Petition. The IURC reached this conclusion by reviewing and interpreting Sections 10 and 20 of the Phase II Settlement Agreement. An interpretation of a settlement agreement is not rulemaking. *See, e.g., Blinzinger v. Americana Healthcare Corp.*, 466 N.E.2d 1371, 1375 (Ind.Ct.App. 1984) (a rulemaking function involves an element of generality, operating upon a class of individuals, and has a prospective effect). Therefore, we conclude that the IURC did not abuse its discretion.

### CONCLUSION

Based on the foregoing, we hold that (1) Appellants waived their argument as to whether the IURC abused its discretion when it held that Section 10 of the Phase II Settlement Agreement precluded the Variance requested by Appellants; (2) the IURC did not render a decision on matters outside Appellants' requested relief; and (3) the IURC did not abuse its discretion when it required Appellants to modify their Qualification Test by excluding the impact of rate reductions that occurred in 2006.

Affirmed.

DARDEN, J., and VAIDIK, J., concur.