**ENHANCED TELECOMMUNICATIONS CORP., Petitioner,**

v.

**INDIANA DEPARTMENT OF STATE REVENUE, Respondent.**

No. 49T10–0801–TA–1.

Tax Court of Indiana.

Nov. 5, 2009.

Larry J. Stroble, Randal J. Kaltenmark, Ziaaddin Mollabashy, Barnes & Thornburg LLP, Indianapolis, IN, Attorneys for Petitioner.

Gregory F. Zoeller, Attorney General of Indiana, Jessica E. Reagan, Jennifer E. Gauger, Deputy Attorneys General, Indianapolis, IN, Attorneys for Respondent.

FISHER, J.

Enhanced Telecommunications Corp. (ETC) challenges the Department of State Revenue's (Department) imposition of Indiana's utility receipts tax (URT) on certain monies it received during the years ending December 31, 2003, December 31, 2004, and December 31, 2005 (the years at issue). The issues for the Court to decide are:

I.    Whether money ETC collected from its customers in "subscriber line charges" and "federal univer-

sal service contribution recoveries" is subject to the URT; and

II. Whether distributions ETC received through various federal and state subsidy programs are subject to the URT.

## FACTS

ETC is a small telecommunications company headquartered in Sunman, Indiana.[1] ETC provides telephone equipment and services, cellular phone equipment, cable services, and internet services to its Indiana customers.

ETC is known within the telecommunications industry as a local exchange carrier ("LEC"): it provides its customers ("subscribers") with local telephone service only. Nevertheless, as an LEC, ETC also facilitates long distance calls made by, and to, its subscribers by providing "access service" to long distance carriers. In other words, ETC allows the long distance carriers to "transport" long distance calls over its lines and through its switches.[2],[3]

As a small, rural LEC, ETC's costs to provide its services are significant.[4] Consequently, to ensure that ETC—and other LECs like it—stay in business as going concerns, the Federal Communications Commission (FCC) and the Indiana Utility Regulatory Commission (IURC) have authorized a system by which the LECs can offset, or recover, some of those costs.

First, LECs are allowed to charge their subscribers directly for a portion of their line costs associated with long distance call activity, both interstate and intrastate. These charges are called "federal subscriber line charges" and "Indiana subscriber line charges" (collectively, "SLCs"). The FCC and the IURC have independently established maximum amounts that may be collected as SLCs.[5] During the years at issue, ETC billed its subscribers for SLCs; the SLCs were separately stated on ETC's bills and were in addition to the price of its basic monthly service.

In turn, LECs can choose to "pool" the money they collect in SLCs with money collected from long distance carriers for "access services" in a fund administered by the National Exchange Carriers Association ("NECA"), a not-for-profit corporation established by the FCC.[6] More specifically:

1. ETC served fewer than 5,000 customers during the years at issue.

2. A "switch" refers to the electronic equipment that processes and routes telephone calls to their proper destination; it is located at an LEC's central, or "end," office.

3. Thus, "[a] long distance call is routed from [an] LEC's end office to [a]connection point with [the long distance carrier] for transport on its long distance network. The call is then handed off ... to the LEC that provides service to the recipient of the call, which then routes it through its switch and over [its lines] to the recipient's location." (Pet'r Br. at 7 (footnote omitted).)

4. "This is understandable because, in sparsely populated areas, [ ] lines might stretch for a considerable distance to reach a relatively small number of customers." (Pet'r Br. at 12–13.)

5. For instance, the FCC established that the maximum federal subscriber line charge that could be imposed was $6.50 for individual lines and $9.20 for business multilines.

6. Prior to 2003, LECs could charge long distance carriers for "nontraffic sensitive" costs. While this charge was eliminated in 2003, the long distance carriers continue to pay into the NECA pool "per minute access charges ... to cover the LECs' 'traffic sensitive costs,' i.e., the costs that var[y] with the volume of long distance traffic." (Pet'r Br. at 10–11.) The NECA pool also receives long-term support payments from carriers that do not participate in the pooling arrangement. (*See* Pet'r Br. at 11–12.)

[t]hese billed revenues are reported to NECA by all member companies[ ] and make up the NECA pool. NECA [then] calculates [an] allocation of [these] ... revenues under the pooling agreements and each [LEC member] is allocated a portion of the pool. The amount of ... charges ... is offset against [the LEC member's] portion of the pool. As a result, [an LEC member] may pay in some of the [ ] revenues it billed or [it may] receive a payment from NECA representing ... revenue collected by other [LEC members].

(First Jt. Stip. Facts, Ex. 13 at 2.) During the years at issue, ETC participated in the NECA pooling arrangement and received distributions from the NECA pool.

Second, in an effort to facilitate its goal of a nationally-integrated, affordable telephone system accessible to all U.S. citizens, the FCC established the Universal Service Fund ("USF"). All companies that provide interstate telecommunications services are required to make contributions to this fund, based on a percentage of their interstate and international revenues.[7] In turn, the Universal Service Administrative Company ("USAC"), which administers the fund, distributes the money, through various subsidies, to qualifying entities (e.g., rural LECs with high costs). During the years at issue, ETC received subsidy distributions from the USF, as well as from Indiana's "equivalent" fund.[8]

## PROCEDURAL HISTORY

For each of the years at issue, ETC filed an Indiana Utility Receipts Tax Return with the Department and paid all tax due in conjunction with each return. The Department subsequently audited those returns and, in a report issued on June 2, 2006, determined that ETC had underreported its URT liability. Specifically, as it relates to this appeal, the Department determined that ETC failed to report the various distributions it received as gross receipts subject to the URT. (*See* First Jt. Stip. Facts, Ex. 4 at 3–4.) Accordingly, the Department issued proposed assessments, including penalties and interest, against ETC.

On October 9, 2006, ETC initiated a protest of the proposed assessments. Then, on April 30, 2007, ETC sent a letter to the Department claiming that the money it collected during the years at issue in

---

7. Nevertheless, these companies are authorized to recover from their subscribers what they must contribute to this fund; these subscriber charges are called "federal universal service contribution recoveries" (FUSCRs). During the years at issue, ETC billed its subscribers the FUSCRs; the FUSCRs were separately stated on ETC's monthly bills and were in addition to the price of its basic monthly service and the SLCs.

8. As the Indiana Court of Appeals recently explained, Indiana now has a similar fund: On March 17, 2004, the IURC approved the creation of the Indiana Universal Service Fund (IUSF), which was designed to promote universal telephone service in a competitive environment. The purpose of the IUSF is to ensure that consumers in all parts of Indiana have access to telecommunication and information services at rates reasonably comparable to those in urban areas. Because the cost of providing telephone service in rural areas is higher than the cost of providing telephone service in an urban setting, the IUSF is designed to offset the revenue losses of rural local exchange carriers[.] These losses occur as a result of Indiana's policy of mirroring at the intrastate level the rates and rate structures of the applicable interstate carrier access charges established by the [FCC] and the high cost of rural telephone service. *Home Tel. Co. of Pittsboro, Inc. v. Verizon N., Inc.,* 904 N.E.2d 223, 225 (Ind.Ct.App.2009), *trans. denied.* Prior to 2004, however, several separate (but similarly purposed) funds existed in Indiana; these funds were financed entirely by long-distance carriers. (*See* Pet'r Br. at 15, 28–29.)

the form of SLCs and FUSCRs should not have been reported as gross receipts subject to the URT. (*See* First Jt. Stip. Facts, Ex. 11.) ETC's letter claimed that between this error and its protest of the proposed assessments, it was actually entitled to a URT refund totaling $24,348.46.[9] (*See* First Jt. Stip. Facts, Ex. 11 (footnote added).)

The Department held an administrative hearing on ETC's protest on April 30, 2007. In a Letter of Findings issued on July 2, 2007, and a Supplemental Letter of Findings issued on November 13, 2007, the Department denied ETC's claims.

On January 10, 2008, ETC filed an original tax appeal.[10] The Court conducted a trial on the matter on January 14, 2009; the Court then heard the parties' oral arguments on July 10, 2009. Additional facts will be provided as necessary.

## STANDARD OF REVIEW

This Court reviews final determinations of the Department *de novo*. IND.CODE ANN. § 6–8.1–5–1(i) (West 2009) (final determinations regarding proposed assessments); IND.CODE ANN. § 6–8.1–9–1(d) (West 2009) (final determinations regarding claims for refund). Accordingly, the Court is bound by neither the evidence nor the issues presented at the administrative level. *See, e.g., Snyder v. Indiana Dep't of State Revenue*, 723 N.E.2d 487, 488 (Ind. Tax Ct.2000), *review denied.*

## DISCUSSION AND ANALYSIS

As a telecommunications company, ETC is subject to the URT. *See* IND.CODE ANN.

§§ 6–2.3–1–13, –14 (West 2003). Accordingly, the URT is imposed on ETC's "entire taxable gross receipts[.]" *See* IND. CODE ANN. § 6–2.3–2–1(1) (West 2003). For purposes of the URT, the definition of "gross receipts" is therefore critical. *See* IND.CODE ANN. § 6–2.3–1–9 (West 2003) (stating that *taxable* gross receipts "means the remainder of: (1) *all gross receipts* that are not exempt from tax under IC 6–2.3–4; less (2) all deductions that are allowed under IC 6–2.3–5" (emphasis added)).

The term "gross receipts" is defined as "anything of value, including cash or other tangible or intangible property, that a taxpayer receives in consideration for the retail sale of utility services for consumption before deducting any costs incurred in providing the utility services." IND.CODE ANN. § 6–2.3–1–4 (West 2003). The term "do[es] not include collections by a taxpayer of a tax, fee, or surcharge that is: (1) approved by the [FCC] or the [IURC]; and (2) stated separately as an addition to the price of telecommunication services sold at retail." IND.CODE ANN. § 6–2.3–3–4(b) (West 2003). The term does "include the amount of any legal settlement or judgment received to compensate the taxpayer for lost retail sales of utility services." IND.CODE ANN. § 6–2.3–3–3 (West 2003). The term also includes "receipts received for installation, maintenance, repair, equipment, or leasing services provided to a commercial or domestic consumer that are directly related to the delivery of utility services to the commercial or do-

---

9. ETC acknowledges that this claim for refund was not on the Department's prescribed form for claiming such. Nonetheless, it maintains that it was a valid claim because it met all the requirements of Indiana Code § 6–8.1–9–1: it was timely filed and it provided the reason for, and the amount of, the requested refund. (*See* Pet'r Br. at 32–35.)

*See also* IND.CODE ANN. § 6–8.1–9–1 (West 2009). ETC is correct. *See UACC Midwest, Inc. v. Indiana Dep't of State Revenue*, 629 N.E.2d 1295, 1298 (Ind. Tax Ct.1994).

10. ETC amended its petition on October 22, 2008.

mestic consumer or the removal of equipment from a commercial or domestic consumer upon the termination of service." IND.CODE ANN. § 6–2.3–3–10 (West 2003).

## I.

■ The first question before the Court is whether the money ETC collected in SLCs and FUSCRs is subject to the URT. The parties agree that the question's resolution is dependent on the answer to a more specific question: are the SLCs and FUSCRs excluded from ETC's gross receipts pursuant to Indiana Code § 6–2.3–3–4(b) because they are "fees" or "surcharges?" [11]

At the outset, the Court notes that the legislature has not defined the terms "fees" and "surcharges" for purposes of either Indiana Code § 6–2.3–3–4(b) or the URT in general. Accordingly, the Court will give those words their plain, ordinary and usual meaning, as defined in the dictionary. *See Johnson County Farm Bureau Coop. Ass'n v. Indiana Dep't of State Revenue,* 568 N.E.2d 578, 580–81 (Ind. Tax Ct.1991), *aff'd by* 585 N.E.2d 1336 (Ind. 1992). A fee is defined as "[a] charge for labor or services[;]" "a charge fixed by law ... for certain privileges or services." BLACK'S LAW DICTIONARY 690 (9th ed.2009); WEBSTER'S THIRD NEW INT'L DICTIONARY 833 (2002 ed.). A "surcharge" is defined as "[a]n additional tax, charge, or cost[;]" "a charge in excess of the usual or normal amount: an additional tax, cost, or impost." BLACK'S LAW DICTIONARY at 1579;

WEBSTER'S THIRD NEW INT'L DICTIONARY at 2299.

Given these definitions, it is clear that the SLCs and FUSCRs are "fees" or "surcharges:" they are charges (or fees) that are in addition to and separate from ETC's charges for its basic monthly service. *See* A.I.C. § 6–2.3–3–4(b)(2) (stating that the collection of "a tax, fee, or surcharge that is ... *stated separately as an addition to the price of telecommunication services sold at retail* " is not included in a taxpayer's gross receipts for purposes of the URT (emphasis added)).

Nevertheless, the Department contends that the SLCs and FUSCRs are "charges" and not "fees or surcharges." To support this contention, the Department has advanced the following arguments:

1) it is inappropriate to use the dictionary's definitions of "fee" and "surcharge" because, in this case, those terms are actually "terms of art used in a highly technical sense by specialized administrative bodies[;]" and

2) because the FCC and the IURC have not specifically referred to the SLCs and the FUSCRs in their regulations as "fees or surcharges," they cannot be "fees or surcharges."

(*See* Resp't Br. at 16–20.) These arguments, however, are flawed in several respects.

First, the Department has offered no other definitions of the terms "fee" and "surcharge" that would be more applicable in this case.[12] Furthermore, the Depart-

---

11. Indeed, the parties' entire dispute centers on whether the FCC and IURC approved the SLCs and FUSCRs as fees or surcharges. (*Cf.* Pet'r Br. at 19–26 *with* Resp't Br. at 16–20.)

12. Instead, the Department merely concludes that if the SLCs and FUSCRs are deemed to be fees or surcharges pursuant to their dictionary definitions, "then even the 'charge' for a customer's standard monthly service would

be excluded from gross receipts ... [and] nothing would be taxed." (Resp't Br. at 18.) This conclusion, however, is nonsensical: it completely ignores the fact that ETC's basic monthly charge—i.e., its charge for the price of its telecommunication services sold at retail—is included in "gross receipts." *See* IND. CODE ANN § 6–2.3–1–4 (West 2003).

ment's position ignores the evidence ETC presented at trial demonstrating that, within the actual telecommunications industry itself, the terms "fee" and "surcharge" do not have highly specialized meanings and are, in fact, often used interchangeably with the term "charge," consistent with their dictionary definitions. (Trial Tr. at 50–51.) (*See also* Pet'r Tr. Ex. 31 (indicating instances where the FCC, the IURC, case law, and a standard telecommunications dictionary often refer to the SLCs and FUSCRs as "fees" or "surcharges").)

Second, the Department essentially seeks to tax the SLCs and FUSCRs based on what they are called, rather than what they represent. Indeed, in its final determination, the Department reasoned that the SLCs and the FUSCRs

> [are] not [ ] "fee[s]" because the FCC has not included [them] in either of the listed schedules of fees. *See* Telecommunications Act of 1996, 47 U.S.C. § 158–9 et seq. (2007).... The [SLCs/FUSCRs are] not [ ] "surcharge[s]." If the FCC wanted to designate the[m] as a surcharge, [they] would have been thus named. For example, 47 C.F.R. Section 69 consistently refers to the "special access surcharge," which the FCC approved as a mandatory "surcharge" to be included on a customer's bill for the cost of certain line terminations. 47 C.F.R. § 69.115 (2005). The [SLCs/FUSCRs are] referred to as [ ] "charge[s]." *See* C.F.R. § 69.104(a) (2005).... The FCC defines a "charge" as "the price for service based on tariffed rates." 47 CFR § 61.3(j) (2005). Accordingly, the [SLCs/FUSCRs are] nothing more than [ ] "charge[s]" the customer pays for telecommunication service.

(First Jt. Stip. Facts, Ex. 12 at 7.) This rationale, however, merely elevates form over substance. *But see Monarch Beverage Co. v. Indiana Dep't of State Revenue,* 589 N.E.2d 1209, 1215 (Ind. Tax Ct.1992) (stating that Indiana determines tax consequences based on the substance of a transaction, not its form). Furthermore, it too ignores the ETC's trial evidence demonstrating that the FCC and the IURC have consistently used the terms "charge," "fee," and "surcharge" interchangeably. (*See* Pet'r Tr. Ex.31.)

ETC's SLCs and FUSCRs are "fees" or "surcharges:" they represent charges, *separate from and in addition to,* ETC's basic monthly service charges. Accordingly, the money ETC collects in SLCs and FUSCRs is excluded from its gross receipts, for purposes of the URT, pursuant to Indiana Code § 6–2.3–3–4(b).

## II.

■ The second issue before the Court is whether the distributions ETC received through various federal and state subsidy programs are subject to the URT. Again, the resolution of the issue hinges on the meaning of "gross receipts."

ETC argues that the distributions are not "gross receipts" and therefore not subject to the URT. Specifically, it argues that the distributions were received from funds furnished by other telecommunications providers, and not "in consideration for the retail sale of utility services for consumption" as required under Indiana Code § 6–2.3–1–4. The Department, on the other hand, advances two arguments as to why the distributions are "gross receipts." First, it claims they are "settlements" pursuant to Indiana Code § 6–2.3–3–3. Second, it contends that the distributions are "directly related to the delivery of utility services" and therefore gross receipts pursuant to Indiana Code § 6–2.3–3–10. Neither of these arguments, however, affords the Department any success.

As stated earlier, the term "gross receipts" "include[s] the amount of any *legal* settlement or judgment received to compensate the taxpayer for lost retail sales of utility services." A.I.C. § 6–2.3–3–3 (emphasis added). The Department asserts that because ETC has repeatedly admitted that the distributions were "settlements," they are to be included in ETC's gross receipts. (*See* Resp't Br. at 14–15 (citations omitted).) The Department's argument, however, fails to consider how the word "settlement" is being used, both by ETC and within Indiana Code § 6–2.3–3–3 itself.

Pursuant to the dictionary, the term "settlement" can have different meanings depending on the context in which it is used. For instance, it can mean "[a]n agreement ending a dispute or a lawsuit." BLACK'S LAW DICTIONARY at 1496. The term can also mean "[p]ayment, satisfaction, or final adjustment . . . of [an] account." *Id.*

During trial, ETC presented evidence explaining that when NECA and USAC allocate and distribute the money in their respective pools/funds, that process is referred to within the telecommunications industry as the "settlement process." (*See* Trial Tr. at 55–56, 75–77.) Thus, when ETC "admitted" the distributions from NECA and USAC were settlements, it was using the term "settlement" consistent with the definition that they were "[p]ayment[s], satisfaction[s], or final adjustment[s] . . . of [its] account[s.]" *See* BLACK'S LAW DICTIONARY at 1496.

Indiana Code § 6–2.3–3–3, however, does not employ that definition of "settlement." Rather, because the legislature has chosen to modify that term by the word *legal*, the statute employs the definition pertaining to "[a]n agreement ending a dispute or a lawsuit." *Id.* Because the distributions in this case are not *legal settlements*, they do not qualify as gross receipts pursuant to Indiana Code § 6–2.3–3–3.

In its second argument, the Department claims that because ETC received the distributions as a means to recover costs associated with the use and "maintenance of its telephone lines," the receipt of the distributions "are directly related to the delivery of utility services[ under Indiana Code § 6–2.3–3–10] and [are therefore] properly included in ETC's taxable gross receipts." (Resp't Br. at 15–16.) Like the Department's previous argument, this argument fails to consider Indiana Code § 6–2.3–3–10 in its entirety.

Pursuant to Indiana Code § 6–2.3–3–10, the term "gross receipts" does indeed include "receipts received for installation, *maintenance,* repair, equipment or leasing services[.]" A.I.C. § 6–2.3–3–10 (emphasis added). Nevertheless, the statute goes on to explain that those receipts must be received in the course of providing such services "to a commercial or domestic consumer that are directly related to the delivery of utility services to th[at] commercial or domestic consumer[.]" *Id.* Here, the distributions clearly do not meet the terms of this statute: they are not receipts received for *maintenance services provided to a consumer that are directly related to the utility services of that consumer. Id.* Rather, the distributions are governmental subsidies that are used to offset the *general* costs of overall line use and maintenance.

### III.

The Court notes that the Department has made two other, more general arguments to support its taxation of ETC's charges and distributions. The Court will address each of these arguments in turn.

The Department first argues that the charges and distributions are gross receipts because ETC *receives* them. Indeed, it explains that under Indiana Code § 6–2.3–1–4, "gross receipts" is defined as "anything of value, including cash or other tangible or intangible property, that a taxpayer *receives* in consideration for the retail sale of utility services for consumption before deducting any costs incurred in providing the utility services." A.I.C. § 6–2.3–1–4 (emphasis added). The Department then cites to Indiana Code § 6–2.3–1–6, which states that the term "receives" means "(1) the actual coming into possession of, or the crediting to, the taxpayer, of gross receipts; or (2) the payment of a taxpayer's expenses, debts, or other obligations by a third party for the taxpayer's direct benefit." IND.CODE ANN. § 6–2.3–1–6 (West 2003). The Department concludes that ETC's charges and distributions are "gross receipts" because they are "something of value that ETC comes into possession of for 'the payment of [its] expenses, debts, or other obligations by a third party for [its] direct benefit' in consideration for the retail sale of utility services." (Resp't Br. at 10.)

Once again, the Department has improperly relied on a "statutory snippet" to support its position. The URT is imposed upon ETC's "entire taxable gross receipts[.]" A.I.C. § 6–2.3–2–1(1). For purposes of this case, ETC's taxable gross receipts are "anything of value, including cash or other tangible or intangible property, that [ETC] receives *in consideration for the retail sale of utility services for consumption*" and that is not specifically exempted from tax under Indiana Code § 6–2.3–4. *See* A.I.C. §§ 6–2.3–1–4, –9.[13] Here, ETC's receipt of the SLCs, FUSCRs, and distributions were not in consideration for the retail sale of utility

services for consumption (i.e., ETC's basic monthly service charge).

In its second argument, the Department does little more than state that when the legislature created the URT in 2002, its intent was "to increase [tax] revenues" from utility companies. (Resp't Br. at 13.) Accordingly, the Department continues, ETC's charges and distributions should be included in gross receipts in order to further that goal. (*See* Resp't Br. at 13.) This argument does little more than state the obvious: *every tax is designed to generate revenues.*

What the Department's argument fails to address is how the imposition of each and every tax is limited by a statutorily-defined "base." In other words, the State's power to tax is contingent upon the occurrence of a very specific event as prescribed by the applicable statutes. *See, e.g.,* A.I.C. § 6–2.3–2–1(1) (the URT is imposed on the "receipt of[ ] the entire taxable gross receipts"); IND.CODE ANN. § 6–2.5–2–1 (West 2009) (explaining that Indiana's sales tax is not imposed on all sales taking place within Indiana, but rather on only those sales that constitute "retail transactions"); IND.CODE ANN. § 6–2.5–3–2 (West 2009) (providing that when Indiana residents acquire tangible personal property outside of Indiana, they are taxed on their subsequent use, storage, or consumption of that property in Indiana); IND.CODE ANN. § 6–4.1–2–1 (West 2009) (Indiana's inheritance tax is imposed "at the time of a decedent's death on certain property interest transfers made by him"). Moreover, these statutes that explain what is taxable and when are strictly construed against the State. *Clifft v. Indiana Dep't of Revenue,* 748 N.E.2d 449, 452 (Ind. Tax Ct.2001) (internal quotation and citation omitted). To the extent ETC has demon-

---

13. The portion of these statutes referencing "deductions" is not at issue in this case.

strated that its SLCs, FUSCRs and distributions do not fall within the meaning of "taxable gross receipts" for purposes of the URT, the Department's argument fails.

## CONCLUSION

For the foregoing reasons, the Department has erroneously subjected ETC's SLCs, FUSCRs, and distributions to the URT. The Department's final determination in the matter is therefore RE-VERSED.[14]

**14.** ETC and the Department have stipulated to the amount of ETC's URT overpayment for each of the taxable years at issue should it prevail in this appeal. (See Second Jt. Stip. Facts ¶ 7, Ex. 25.) The matter is therefore remanded to the Department for action consistent with that stipulation.